18598

Robert NORTON and Viola C. Norton, Respondents, v. Clyde C. MATTHEWS, Individually and as Administrator of the Estate of Ernest F. Matthews, Appellant.

(152 S. E. (2d) 680)

*Messrs. McEachin, Townsend & Zeigler,* of Florence, *for appellant,*

*Messrs. Dusenbury, Dusenbury & McKenzie,* of Florence, *for respondents,*

February 3, 1967.

BUSSEY, Justice.

In this suit in equity plaintiffs, Mr. and Mrs. Norton, who are husband and wife, seek specific performance of an alleged oral contract on the part of Ernest F. Matthews to devise to plaintiffs a fifty acre tract of land in Florence County where the said Matthews resided. Appeal is from an order of the circuit court decreeing such specific performance.

Ernest F. Matthews died intestate in September, 1962. The defendant-appellant is his brother and the administrator of his estate. Mr. Matthews was a farmer and he and his wife had no children. He did not enjoy good health for a number of years, having suffered a stroke about 1955. Mrs. Matthews died in the year 1960, and following her death the health of Mr. Matthews deteriorated further. He was suffering, among other things, from an extreme case of diabetes. In the fall of 1960, as the result of a fall, he injured a heel which due to his diabetes did not readily respond to treatment. He increasingly needed help with his business affairs and nursing care at home. He entered the hospital in November 1961, and it was necessary to amputate one of his legs on or about January 13, 1962. Later that year the other leg had to be amputated.

The Nortons were friends of the Matthews of fairly long standing and lived some two and a half miles away. Their complaint alleges that during the summer of 1960 Mr. Norton and Mr. Matthews had several conversations and negotiations and entered into an agreement whereby the plaintiff Robert Norton would render certain services, including the handling of certain business affairs, and the nursing activities of Mrs. Norton, and in return Mr. Matthews bargained and agreed to will to the plaintiffs, jointly, his home tract of land containing fifty acres.

The complaint further alleges that the plaintiffs, pursuant to the agreement, faithfully and fully performed the duties

they had promised until December 29, 1961, when Mr. Matthews was confined to the hospital and where a relative or relations of his prevailed upon him, without any just cause or legal excuse, to attempt to revoke a will made pursuant to the alleged contract, and to breach the agreement between the parties. The evidence tending to prove that a contract was entered into would indicate the date thereof to be the summer of 1961, rather than 1960, and that the duration of such was the lifetime of Mr. Matthews.

The record reflects that the Nortons rendered considerable neighborly services to both Mr. and Mrs. Matthews for quite some time prior to the summer of 1961. On the 3rd day of August 1961, Mr. Matthews executed a will wherein he devised to plaintiffs the tract of land in litigation, together with "all furniture, farm equipment, fixtures and supplies on the place and in the house." On or about the 14th of August 1961, a joint bank account was established upon which checks could be drawn by either Mr. Matthews or Mr. Norton, in which account substantial sums of money belonging to Mr. Matthews were deposited. Checks were drawn on this account by Mr. Norton in payment of Mr. Matthews' bills until approximately the end of the year 1961, the checks being some twenty-one in number. On January 9, 1962, Mr. Matthews had this bank account changed so that Mr. Norton could no longer write checks thereon. The balance in said account on that date was $13,239.51. Mr. Matthews destroyed the will which he made on August 3, 1961. The exact date of the destruction does not appear, but, inferentially, such occurred about the time of the change of the bank account.

From early in January, 1962, until the death of Mr. Matthews plaintiffs performed no service of any consequence to Mr. Matthews. It is not alleged or contended that they did, their contention being that they were prevented, through no fault of their own, from fully performing on their part the alleged oral contract.

The law is well established in this jurisdiction that a promisee seeking specific performance of an oral contract to devise realty in consideration of services rendered by the promisee to the promisor, must prove by clear, cogent and convincing evidence the existence of the contract, the certainty of the terms thereof, and that promisee has not only always been ready and willing to perform, but has also fully performed. *Young v. Levy,* 206 S. C. 1, 32 S. E. (2d) 889; *Samuel v. Young et al.,* 214 S. C. 91, 51 S. E. (2d) 367.

The promisee is not bound, however, to prove complete performance if such becomes impossible through no fault of the promisee. *Young v. Levy, supra; Bruce v. Moon,* 57 S. C. 60, 35 S. E. 415. It follows, however, that where there is a failure of performance on the part of the promisee, the burden is upon him to prove that such was made impossible through no fault on his part.

We deem it unnecessary in this case to review and analyze all the evidence relied upon by the plaintiffs to prove the alleged contract, for the purpose of determining whether a contract has been proved by the high degree of proof required in cases of this kind. Even assuming the existence of such a contract, we do not think the plaintiffs are entitled to prevail. While not conclusive of the issue, the plaintiffs here, unlike the plaintiffs in most cases of this type, did not agree or undertake to move into the home of Mr. Matthews and assume anything like full time responsibility for his care. The record reflects that both the plaintiffs rendered considerable service to Mr. Matthews from the summer of 1961 until about the end of the year, during which time they were in and out of his home quite a lot. Except, however, for the joint bank account, it does not appear that their services were substantially different in kind from the neighborly services they had rendered to Mr. Matthews prior to the existence of any alleged contract.

The evidence shows that Mr. Matthews became unhappy with the Nortons during the early part of January, 1962, as a result of two things. He received from Mr. Norton in connection with the bank account a statement on a small slip of paper, presumably an adding machine tape, which Mr. Matthews did not think was a satisfactory statement, although it is not contended that Mr. Norton misused any of Mr. Matthews' funds, or that Mr. Matthews even thought he had. He simply thought he was entitled to a more detailed statement. The other point of dissatisfaction arose in connection with the nurses attending Mr. Matthews in the hospital. Precisely what did happen with respect to the nurses does not clearly appear from the record.

From shortly after Mr. Matthews' admission to the hospital, on or about November 18, 1961, until about the end of that year, he had trained nurses in attendance around the clock. The evidence is in some conflict as to events which apparently occurred in the early part of January. Two nurses who were in attendance upon Mr. Matthews testified that Mrs. Norton wanted to cut down on expenses by curtailing nursing services and gave them both notice that they would only be kept on a few more days, and that conversations about cutting down on the nursing services occurred in the presence of Mr. Matthews. These nurses contended that Mrs. Norton actually discharged the night nurse, but it is apparent from their testimony that all they really knew was that the night nurse was not present for some few nights, her turn being taken by Emanuel Brooks, a negro share-cropper on lands of Mr. Matthews who, the evidence reflects, had waited on Mr. Matthews a lot at home doing service as both nurse and orderly. On the other hand, Mrs. Norton testified that the night nurse quit.

Although Mrs. Norton was called as a reply witness, she did not contradict the testimony of the two nurses as to her conversation and activity toward reducing the nursing service and contented herself with testifying that she had never actually discharged any nurse. The testimony of the

nurses as to Mrs. Norton wanting to cut down on the expense of nursing services is not contradicted by any other witnesses. In addition to being a substantial property owner, Mr. Matthews at the time had over thirteen thousand dollars in his bank account, out of which the nurses were being paid. While it may very well be that Mrs. Norton was completely altruistic and was simply trying to protect Mr. Matthews from any unnecessary expense, the uncontradicted evidence on the part of the nurses is susceptible of the inference that Mrs. Norton's interest was in protecting Mr. Matthews' assets, looking toward the day of his death, for the benefit of the Nortons. Whatever her attitude or reason thereabout was, we think it is also inferable that at least one of the nurses contributed to Mr. Matthews' dissatisfaction about the matter.

While the record shows the causes of dissatisfaction on the part of Mr. Matthews, no proof is offered by the plaintiffs that Mr. Matthews did or said anything to terminate the services of the Nortons other than changing the bank account, which fact, of course, made it impossible for Mr. Norton to continue much of the service he had been rendering Mr. Matthews. On the other hand, that simple fact did not prevent Mrs. Norton from continuing her services if she so desired.

The uncontradicted evidence in the record is to the effect that Mr. Matthews at all pertinent times was in very poor health, easily upset, "mean and grouchy", which facts were well known to the plaintiffs.

In the case of *Flowers v. Roberts,* 220 S. C. 110, 66 S. E. (2d) 612, this court quoted with approval from 57 Am. Jur. 153, Wills, Section 172, the following:

"An undertaking 'to take care of' aged persons, in consideration of a promise to devise property, has been held to contemplate a great patience with their infirmities, and to include * * * good temper, forbearance, and an honest effort to please."

The only reasonable inference from the record is that the Nortons knew the causes of dissatisfaction and misunderstanding on the part of Mr. Matthews, as well as his physical and emotional condition. Yet, the record contains no suggestion that either of them made any effort to placate Mr. Matthews and continue the performance of the services which they allegedly contracted to perform. The record supports the conclusion that they were not completely without fault in bringing on the dissatisfaction. Conceding that the fault on their part was not sufficiently grave to constitute a breach of contract, still, under the circumstances, equity and good faith would require at least some effort on their part to resolve the differences and continue the performance of their obligations. Instead of making any such attempt, the record would rather indicate that they were willing and content to cease performance and make no further effort.

In *Samuel v. Young,* 214 S. C. 91, 51 S. E. (2d) 367, it was said,

"It is a well established rule that a party cannot demand the specific performance of a contract of this kind as a matter of right, but that the exercise of this power rests in the sound discretion of the court, in view of all the surrounding circumstances. Before appellant was entitled to this remedy she was required to show not only that she had always been ready and willing to perform on her part, but that the contract had been fully performed by her; and the burden was upon her to prove her case. Such proof by one who invokes the aid of equity should not consist of vague or shadowy evidence or by a mere preponderance of evidence, but by evidence so unquestionable in its character, so clear, cogent and convincing, that no reasonable doubt can be entertained of its truth;"

See also in this connection, *Masonic Temple, Inc. v. Ebert,* 199 S. C. 5, 18 S. E. (2d) 584; *Flowers v. Roberts, supra.*

The foregoing authorities are to the effect that among the matters which may be considered by the court in deter-

mining the right to specific performance is the well known maxim of equity that "He who seeks equity must do equity." Under all of the circumstances reflected by the record, we conclude that if the Nortons expected to hold Mr. Matthews to the alleged oral contract, equity on their part demanded that they should at least have made some effort to resolve the misunderstandings and tender the continued performance of their services to Mr. Matthews. We think that they have not proved, with the high degree of proof required in cases of this kind, that complete performance on their part became impossible through no fault of theirs. Accordingly, we think the lower court was in error in decreeing specific performance, which conclusion on our part renders unnecessary any discussion of appellant's other exceptions.

The judgment of the lower court is reversed.

Reversed.

Moss, C. J., Lewis and Brailsford, JJ., and Lionel K. Legge, Acting J., concur.