531 S.E.2d 287

**Henry INGRAM, Respondent,**

v.

**KASEY'S ASSOCIATES, a South Carolina Limited Partnership and Roy Prescott d/b/a Remy's, Inc. and Remy's, Inc. Petitioners.**

**No. 25116.**

Supreme Court of South Carolina.

Heard Dec. 15, 1999.

Decided May 1, 2000.

Rehearing Denied June 6, 2000.

---

G. Richardson Wieters, of G. Richardson Wieters, P.C., of Hilton Head, and Stephen A. Spitz, of Columbia, for petitioner Kasey's Associates.

H. Fred Kuhn, Jr., of Moss & Kuhn, of Beaufort, for petitioners Roy Prescott d/b/a Remy's, Inc. and Remy's, Inc.

Samuel S. Svalina, of Svalina Law Firm, and J. Brent Kiker, of Kiker & Douds, P.A., both of Beaufort, for respondent.

TOAL, Justice:

Kasey's Associates ("Kasey's") and Roy Prescott ("Prescott") appeal the Court of Appeals' decision that Henry Ingram's ("Ingram") written notice of intent to exercise his option was sufficient to fulfill the terms of the option contract. The decision of the Court of Appeals is **REVERSED** for four main reasons: (1) the Court of Appeals used no equity doctrines, even though Ingram sought an equitable remedy; (2) the Court of Appeals did not strictly construe the option contract in favor of the optionor and against the optionee; (3) the Court of Appeals disregarded specific findings of fact made by the trial judge that Ingram was unable to pay the purchase price within the lease period; and (4) the Court of Appeals recognized only the general rule of options, which does not apply to all option contracts in every context.

### FACTUAL/PROCEDURAL BACKGROUND

On March 1, 1984, Ingram entered into a ten-year commercial lease with Kasey's for 'Remy's Restaurant ("Remy's") located on Hilton Head Island, South Carolina. After entering into the lease, Ingram and Prescott entered into an oral sublease for the operation of the restaurant, its furniture, fixtures, and equipment. As a part of this arrangement with

Prescott, Ingram received a percentage of the profits from the video poker machines he installed in Remy's. From March 1, 1984 until the end of the lease term on February 28, 1994, Prescott operated the restaurant and paid the rent.

The lease between Ingram and Kasey's contained a provision giving Ingram the right to purchase the property at any time during the lease term for a certain sum based upon an amortization schedule attached to the lease. The lease contained the following option to purchase:

> Lessee shall have the right to purchase the premises at any time during the term hereof, as is described in this paragraph; provided however, that this right shall terminate forthwith upon default of the lessee, as provided in Paragraph 6 hereof.

The remainder of the paragraph describes how to calculate the purchase price, lists the credits Ingram would receive if he purchased the property, and refers to the amortization schedule.

During the fall of 1993, as the lease was nearing the expiration of the term, Ingram and Kasey's discussed whether Ingram desired to purchase the property. Ingram indicated he would not exercise his option and that Kasey's and Prescott were free to negotiate a deal to lease the restaurant. Relying on Ingram's representations, Kasey's and Prescott entered into a new lease for Remy's to become effective on March 1, 1994, and Kasey's spent $135,000 to acquire adjacent property in order to expand Remy's.

Despite his previous representations, on February 22, 1994, Ingram provided written notice to Kasey's that he intended to exercise his option to purchase the property. The February 22, 1994 letter to Bernard Craig ("Craig"), general partner of Kasey's, states in part:

> This will serve to advise you that I am hereby exercising my option and right to purchase the above-referenced premises pursuant to the option contained in the above described lease Agreement dated March 1, 1984, between Casey's [sic] Associates, a South Carolina Limited Partnership, as Lessor, and myself, as Lessee.

Craig responded with a letter on February 24, 1994 stating that Ingram had represented he was not going to exercise the

option, and Craig had relied on these representations by purchasing adjacent property and beginning renovations on Remy's. Craig also advised Ingram that the property had to be purchased on or before the close of business on February 28, 1994 in accordance with the lease term. However, in the event Ingram paid the purchase price, Kasey's executed its deed to Ingram and transmitted the deed to its attorney for delivery to Ingram upon payment of the purchase price. Ingram never tendered any portion of the purchase money prior to the end of the lease term on February 28, 1994. On March 8, 1994, Ingram wrote Craig that he was ready, willing, and able to close the sale on March 10, 1994. Kasey's attorney responded that he would not close because the lease required Ingram to tender the purchase price before its expiration on February 28, 1994.

Ingram did not have the money to purchase the property on February 28,1994, March 8, 1994, March 10, 1994, or March 14, 1994. None of Ingram's lenders officially agreed to loan him the purchase money and Ingram had no written loan agreements. In fact, one of the lenders indicated the affidavit he provided to support Ingram's summary judgment motion was a "hoax" and that he did not have the money to loan Ingram. The trial testimony also indicates that none of the lenders identified by Ingram were contacted until after the lease expired on February 28, 1994.

On March 14, 1994, Ingram sued both Kasey's and Prescott for specific performance arising from his attempt to exercise his option to purchase property contained within the ten-year lease. Ingram also filed a lis pendens on the leased real and personal property on March 14, 1994. On November 13, 1995, the trial judge entered an order denying specific performance of the option contract. Ingram appealed and on August 19, 1997, the Court of Appeals reversed the trial judge's decision and remanded the matter to the trial court for further factual findings on the issues of estoppel, waiver, abatement of purchase price, Ingram's ability to close within a reasonable time, and unclean hands. *Ingram v. Kasey's Assocs.*, 328 S.C. 399, 493 S.E.2d 856 (Ct.App.1997). Kasey's and Prescott have appealed on the following issues:

(1) Did the Court of Appeals err in holding Ingram proper-
ly exercised the option by sending written notice of his

acceptance, without tendering the actual purchase price, prior to the expiration of the lease?

(2) Did the Court of Appeals disregard specific findings of fact made by the trial judge that Ingram was unable to pay the purchase price either within the lease period or soon thereafter?

### LAW/ANALYSIS

Kasey's and Prescott argue that the Court of Appeals erred in holding that written notice of Ingram's intent to exercise the option, without the actual tender of the purchase price, was sufficient to fulfill the terms of the option contract. We agree. Our discussion will be divided into two parts. Part I will address the law of specific performance because that is the equitable remedy Ingram requests. Part II will address the law of options. The Court of Appeals found there was one general, overriding rule that applied to all option contracts. Although this general rule exists, it does not apply to every circumstance. In particular, when an option is embedded in another type of contract, such as a lease, option law depends greatly upon the context in which the option was entered.

### I. Specific Performance

Ingram's action for specific performance of his option contract is in equity. *Collier v. Green*, 244 S.C. 367, 137 S.E.2d 277 (1964). In equity actions an appellate court can review the record and make findings based on its view of the preponderance of the evidence. *Townes Assoc. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976); *Pruitt v. South Carolina Med. Malpractice Liab. Joint Underwriting Ass'n*, 335 S.C. 118, 515 S.E.2d 544 (Ct.App.1999). However, this Court is not required to disregard the findings of the trial judge who saw and heard the witnesses and was in a better position to judge their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E.2d 538 (1989); *Wright v. Trask*, 329 S.C. 170, 495 S.E.2d 222 (Ct.App.1997).

Specific performance should be granted only if there is no adequate remedy at law and specific enforcement of the contract is equitable between the parties. *King v. Oxford*, 282 S.C. 307, 318 S.E.2d 125 (Ct.App.1984) (citing *Monteith v.*

*Harby,* 190 S.C. 453, 3 S.E.2d 250 (1939)). In order to compel specific performance, a court of equity must find: (1) there is clear evidence of a valid agreement; (2) the agreement had been partly carried into execution on one side with the approbation of the other; and (3) the party who comes to compel performance has performed his or her part, or has been and remains able and willing to perform his or her part of the contract. *Gibson v. Hrysikos,* 293 S.C. 8, 358 S.E.2d 173 (Ct.App.1987) (citing *Thomson v. Scott,* 6 S.C. Eq. (1 McCord Eq.) 32 (1825)). At a minimum, Ingram must demonstrate that he was ready and willing to perform his part of the contract (i.e. willing to tender the purchase price) on February 28, 1994, the date the lease expired, or on March 14, 1994, the date he brought the action for specific performance.[1] The record indicates that Ingram was not in a position to pay Kasey's the purchase price for Remy's on either date.

Ingram admits that prior to February 28, 1994 he did not have the purchase money in any depository account either under his control, his attorney's control, or in any escrow account. Ingram also admits that in order to close on the property he would have to "scramble around and see if [he] could raise up the money." Although Ingram claims he had several sources who could provide the purchase money, as of March 14, 1994, none of his identified lenders officially agreed to loan him the money, and he had no written loan agreements. In fact, several lenders admitted they did not even have access to the money to loan Ingram. Specific performance is unsound in this case because Ingram lacked the ability to perform his part of the option contract on the date the lease expired and on the date he sought specific performance. *See* 71 Am.Jur.2d *Specific Performance* § 201 (1973) ("[C]omplainant in an action for specific performance must aver that he has performed his part of the contract or that he is willing and ready to perform it, and that he has performed all conditions precedent to the taking effect of the obligation of

---

1. The Court of Appeals expands the time for Ingram to tender the money until a "reasonable time" after he provided written notice of his intent to exercise the offer. However, this time frame does not coincide with the specific performance Ingram requested. Ingram must be able to perform at the exact time he requested specific performance, not some "reasonable time" in the future.

the defendant, including the payment to be made thereon, or some valid excuse for his failure to perform or offer to perform.").

In the instant case, equity does not favor the granting of specific performance as a matter of sound judicial discretion. We rely on the equity maxim: "He who seeks equity must do equity." *Norton v. Matthews,* 249 S.C. 71, 152 S.E.2d 680 (1967). Ingram misled Kasey's and Prescott by promising he would not exercise his option. In reliance on his representations, Kasey's and Prescott negotiated a new deal to lease Remy's. Ingram's misrepresentations were particularly egregious because he knew Kasey's was planning to purchase property adjacent to Remy's for $135,000 in reliance on his promise not to exercise his option. According to Craig, Ingram was also aware that time was of the essence for Kasey's because, due to new zoning ordinances, Remy's could operate at the leasehold site only because it was grandfathered. Ingram's actions, therefore, placed Kasey's at great risk because Remy's needed to be in continuous operation in order to maintain its grandfathered status. Additionally, the evidence demonstrates that Ingram only decided to exercise the option on February 22, 1994 because he was in a dispute with Prescott over how much Prescott would pay him for the right to run Remy's. Thus, Ingram has an improper ulterior purpose for using Kasey's to pressure Prescott. Ingram is estopped from seeking specific performance because he acted with unclean hands by misleading both Kasey's and Prescott, and because he acted with the improper ulterior motive to force Prescott to pay him $40,000.[2]

---

**2.** The doctrines of unclean hands and equitable estoppel can be used to preclude Ingram from recovering in equity. Unclean hands precludes a plaintiff from recovering in equity if he acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant. *First Union Nat. Bank of South Carolina v. Soden,* 333 S.C. 554, 511 S.E.2d 372 (Ct.App.1998). Elements of equitable estoppel as to the party estopped are: (1) conduct by the party estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the true facts. As to the party claiming the estoppel, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; and (2) reliance upon the conduct of the party estopped. *Maher v. Tietex Corp.,* 331 S.C. 371, 500 S.E.2d 204 (Ct.App.1998).

## II. Option Contracts

Option contracts generally have three main characteristics: (1) they are unilateral contracts where the optionor, for a valuable consideration, grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; (2) they are continuing offers to sell, irrevocable during the option period; and (3) the transition of an option into a contract of purchase and sale can only be effected by an unqualified and unconditional acceptance of the offer in accordance with the terms and within the time specified in the option contract. *See generally* J.R. Kemper, *Necessity for Payment or Tender of Purchase Money Within Option Period in Order to Exercise Option, in Absence of Specific Time Requirement for Payment,* 71 A.L.R.3d 1201, 1205 (1976). It is well settled in South Carolina that option contracts are strictly construed in favor of the optionor and against the optionee. *See Cotter v. James L. Tapp Co.,* 267 S.C. 647, 230 S.E.2d 715 (1976). Furthermore, if the option requires performance in a certain manner, time is of the essence and exact compliance with the terms of the option are required. *Id.* at 653, 230 S.E.2d at 717–718.

In the instant case, Ingram did not comply with the exact terms of the option contract because he did not purchase Remy's "at any time during the lease's term." He provided written notice to Kasey's during the lease term indicating that he planned to exercise his option in the future. Generally, actual payment is essential to the acceptance of an option contract when payment is made a condition precedent to the exercise of the option. *See* 91 C.J.S. *Vendor and Purchaser* § 10 (1951); 77 Am.Jur.2d *Vendor and Purchaser* § 53 (1997) ("Where an option by its express terms requires that the payment of the purchase money or a part thereof accompany the optionee's election to exercise the option, the making or tender of the payment specified, unless waived by the optionor, is a condition precedent to the formation of a contract to sell."). However, the Court of Appeals held that written notice was sufficient because once Ingram provided notice "he bound himself to a bilateral and executory contract for the sale of land." *Ingram,* 328 S.C. at 407, 493 S.E.2d at 860.

The Court of Appeals adopted the general rule of option contracts, or the "Williston rule" which states:

Especially in cases of options for the sale of land, most courts interpret the option as conditioned upon the giving of a promise to pay the price for the land, that is, as calling for the formation of a bilateral contract rather than for tender of the actual performance, which would be required for acceptance in a unilateral contract.

*Ingram,* 328 S.C. at 406, 493 S.E.2d at 860 (quoting 1 Richard A. Lord, *Williston on Contracts* § 5:18, 738–739 (4th ed.1990)). In cases where the option contract does not explicitly require the payment of the purchase price as a condition precedent to the exercise of an option, "courts have generally been inclined to construe such agreements as calling simply for a promise by the optionee to pay the price, rather than for actual payment thereof." 71 A.L.R.3d 1201, 1219 (1976).

To determine whether actual payment is required to exercise an option, it is important to look at both the specific language used in the option contract and also the context in which it was made. The Court of Appeals correctly cited the general rule for the exercise of an option contract. However, this rule is not applicable to every circumstance. For example, an option provision embedded in a *lease* is very different than a free standing real estate option contract:

In the absence of a provision in the option agreement specifying the time or method of payment, the question of whether the purchase price or a part thereof must be paid or tendered in order to exercise the option has generally been found to depend on whether the terms of the option require the payment of a fixed sum at the expiration of a certain period, *such as the term of a lease, in which case payment is required in order to exercise the option.*

77 Am.Jur.2d *Vendor and Purchaser* § 53 (1997). Other courts have held that a lease provision providing a lessee an option to purchase requires payment at the time of the exercise of the option. *See Burns v. Reves,* 217 Ga.App. 316, 457 S.E.2d 178 (1995) (lessee's option to purchase leased premises was lost where lessee only notified landlord of intention to purchase property and purchase monies were not

secured within option period); *Hofmann v. Sullivan*, 599 P.2d 505 (Utah 1979).

In this case, the use of a lease had practical significance to Kasey's. Because of the incorporation of the town of Hilton Head and the enactment of new zoning ordinances, Remy's could operate at the leasehold site only because it was grand-fathered. Kasey's could not wait for Ingram to purchase the property at some "reasonable time" after he exercised his option because Remy's would risk losing its grandfathered status if it did not remain in continuous operation. Also, the nature of a lease is different than that of a contract to sell. Kasey's gave Ingram a lease for a specific duration and anticipated that a new lessee would take over the lease at the expiration of the lease's term. Kasey's is not forced to wait for Ingram to exercise his option at some "reasonable time" after the expiration of the lease term because waiting on Ingram would unfairly penalize Kasey's by causing them to lose business profits, potential lessees, and grandfathered status.

Other courts have adopted a fact-specific rule for the inter-pretation of option contracts involving leases. In *Odyssey Glass Corp. v. Simenaur*, 47 Md.App. 645, 425 A.2d 249 (1981), the Maryland Court of Special Appeals held that the proper exercise of an option to purchase required tender of payment during the term of the lease. The court held that the case "must be determined on the basis of its own specific circum-stances." *Id.* at 253. The court found that the lessor's rapid response to the lessee's notice of intent indicated he was willing to sell the property for the stated price, as long as the transaction was completed during the lease term. *Id.*

An option contract is interpreted according to its actual terms and the context in which the contract was made. In general, if the contract is unambiguous, clear, and explicit, it must be construed according to the terms the parties have used, and the terms are to be taken and understood in their plain, ordinary, and popular sense. *See C.A.N. Enterprises, Inc. v. South Carolina Health and Human Serv. Fin. Comm'n*, 296 S.C. 373, 377, 373 S.E.2d 584, 586 (1988). If the option contract specifically makes the tender of the purchase price a condition precedent to the option's exercise, then the

plain language of the contract controls and actual tender is required. *See Catawba Athletics, Inc. v. Newton Car Wash, Inc.*, 53 N.C.App. 708, 281 S.E.2d 676 (1981) ("If a lease and option to purchase realty is clearly expressed, it must be enforced as written and the court may not disregard the plainly expressed meaning of its language."). However, in situations similar to the instant case, where the option contract only requires payment "at any time during the terms [of the lease]," this Court will consider the context in which the contract was made and attempt to effectuate the intent of the contracting parties.

This rule does not conflict with current South Carolina case law. In fact, the South Carolina cases dealing with option contracts have been decided on a factual basis, recognizing the difference between a free standing option contract to purchase real estate and an option provision embedded in a lease. In *Conner v. Alvarez*, 285 S.C. 97, 328 S.E.2d 334 (1985), this Court applied the general rule (i.e. "Williston rule") to an option to purchase a house contained in a rental agreement. This Court held that the option was exercised when the purchaser's attorney sent a letter providing notice of intent to exercise the option. This Court correctly applied the general rule as discussed by the Court of Appeals in *Ingram.*

In *Cotter v. James L. Tapp Co.*, 267 S.C. 647, 230 S.E.2d 715 (1976), this Court held that a tenant's failure to comply literally with the terms of an option provision to extend a lease negated his ability to exercise the option. This Court held that the option required performance in a certain manner to renew the lease. The fact that the tenant gave notice that he wished to extend the option was irrelevant. The lessor was entitled to "exact compliance with the terms of the option and there is simply no way to equate a requirement to pay money with the giving of notice." *Id.* at 653–654, 230 S.E.2d at 718.

### CONCLUSION

Based on the foregoing, the decision of the Court of Appeals is **REVERSED**.

FINNEY, C.J., MOORE, WALLER, and BURNETT, JJ., concur.