703 S.E.2d 207

**ALEXANDER'S LAND COMPANY, L.L.C., Alexander's Restaurant Company, Inc.; Franz Auer, John Peterson, Jr. and Bruce O. Rossmeyer, Plaintiffs,**

**Of Whom Alexander's Land Company, L.L.C. and Alexander's Restaurant Company, Inc. are the Respondents,**

v.

**M & M & K Corporation, IFBIFB Corporation, and Roger Keyes, Defendants,**

**Of Whom M & M & K Corporation and IFBIFB Corporation are the Petitioners.**

**No. 26895.**

Supreme Court of South Carolina.

Heard Sept. 22, 2010.

Decided Nov. 22, 2010.

Rehearing Denied Jan. 19, 2011.

584

Robert L. Widener, of McNair Law Firm, of Columbia, and Stephen Edward Carter, of McNair Law Firm, of Hilton Head Island, both for Petitioners.

C. Mitchell Brown, of Nelson, Mullins, Riley & Scarborough, of Columbia; I.S. Leevy Johnson, of Johnson, Toal & Battiste, of Columbia; and Richard A. Farrier, Jr., Walter T. Cox, III, and Andrea St. Amand, all of Nelson, Mullins, Riley & Scarborough, of Charleston, for Respondents.

Justice BEATTY.

This dispute arose out of the attempted exercise of an option to purchase real property where a restaurant is situated. The trial court denied the buyer's request for specific performance of the option. The Court of Appeals held the buyer was entitled to specific performance, finding that, except for failing to meet a condition precedent, the buyer had properly exercised the option and thus the seller should have given the buyer notice of default and a right to cure. *Alexander's Land Co. v. M & M & K Corp.*, Op. No.2007–UP–364 (S.C. Ct.App. filed Aug. 29, 2007). We granted a petition for a writ of certiorari to review the decision of the Court of Appeals and now reverse.

## I. FACTS

### A. Restaurant Purchase and Lease Agreements

The restaurant at the heart of this dispute, Alexander's, is located in the Palmetto Dunes area of Hilton Head Island on property owned by IFBIFB Corp. ("Seller"). M & M & K Corp. ("MMK") operated the restaurant under a lease agreement with the Seller, using its own equipment. Rodger A. Keyes is the sole shareholder of both corporations.

In 1996, a group including Franz Auer, John E. Peterson, Jr., and Bruce O. Rossmeyer ("Investors")[1] desired to purchase the restaurant business and the real property where it is situated. After extensive negotiations, during which the parties were represented by counsel, the Investors reached an agreement with Keyes for a multi-stage transfer structured over a period of three to five years.

---

1. Joseph N. Caruso was also in the group of Investors named in the initial contract, but he is no longer involved in the business and is not a party to these proceedings.

On November 25, 1996, the Investors formally entered into an "Asset Acquisition Agreement" ("Asset Agreement") with MMK to purchase the operating assets of the restaurant owned by MMK, including its business equipment and related personal property, trade name, phone number, and goodwill.

The Investors were to take possession of the premises on December 2, 1996 and continue operating the restaurant as an ongoing enterprise. The closing date for the asset purchase was initially set to occur in three years, on December 1, 1999, with the Investors having the right to postpone the closing for two additional, one-year periods by giving MMK written notice of their intent to do so 90 days prior to the initial closing date or the end of a renewal term. Thus, the latest date for closing on the asset purchase would be in five years, on December 1, 2001.

In a separate document, the Investors executed an assignment of their rights under the Asset Agreement to their newly-formed corporation, Alexander's Restaurant Co., Inc. ("Buyer"), which was established to run the restaurant.

The Asset Agreement incorporated several exhibits that were expressly stated to be "an integral part of this Agreement": (1) a "Personal Property Lease" between the Buyer and MMK regarding some of the restaurant assets; (2) a "Sublease Agreement (Including Option)" by which the Buyer subleased the restaurant premises from MMK (which held the original lease with the Seller); and (3) a "Restated Commercial Lease (Including Option)" directly between the Seller and the Buyer that was not executed at that time since it was to take effect only after the closing on the sale of the business assets.

As part of the original transaction, the Seller granted the Buyer an option to purchase the real property. It appears as Paragraph 22.16 in both the Sublease and the Restated Commercial Lease.

The Sublease Agreement between the Buyer and MMK was effective December 1, 1996. The Sublease stated MMK had a commercial lease with the Seller for use of the restaurant premises, and MMK was subleasing the property to the Buyer for a three-year term ending November 30, 1999, with the option of two, one-year renewal terms, the same as the terms

of the Asset Agreement. The Sublease required the Buyer to extend the closing date of the asset purchase in order to extend the Sublease.

The Sublease provided the Buyer with an option to purchase the real property where the restaurant is located (including a 5,800 square foot building) at a cost of $1,650,000.00. As a condition precedent to exercise of the option, the Buyer was required to "have consummated the purchase of [MMK's] business" and to have paid all amounts due to MMK under the Asset Agreement and the Personal Property Lease. The option to purchase provided as follows:

22.16 *Option to Purchase.* Subject to the condition precedent set forth below, the LANDLORD [the Seller] grants to SUBTENANT [the Buyer], during the first and second renewal term [an] option to purchase (the "Option") the Premises upon the following terms and conditions:

(a) A purchase price of ONE MILLION SIX HUN-DRED FIFTY THOUSAND AND NO/00 [dollars] ($1,650,000.00).

(a) The Option must be exercised in writing not later than ninety (90) days prior to the end of the second renewal term and not earlier than ninety (90) days prior to the commencement of the first renewal term. Failure to exercise the option shall cause it to automatically expire without further action by LANDLORD [the Seller].

(a) Upon the exercise of the Option, SUBTENANT [the Buyer] shall deposit an earnest money deposit with LANDLORD [the Seller] in an amount equal to FORTY-ONE THOUSAND TWO HUNDRED FIFTY AND NO/00 [dollars] ($41,250.00) representing TWO AND ONE/HALF PERCENT (2.5%) of the purchase price.

(d) Closing shall occur within ninety (90) days from the date of exercise of the Option.

. . . .

As a condition precedent to the exercise of this Option, SUBTENANT [the Buyer] must have consummated the purchase of TENANT'S [MMK's] business, pursuant to the terms and conditions of the Asset Acquisition Agreement (**Exhibit "B"**). In addition, it is explicitly recognized that

this Option can not [sic] be exercised until TENANT [MMK] has received all amounts owed to it under the Asset Acquisition Agreement and the Personal Property Lease.[2]

## B. Dispute Concerning Option

The Buyer operated the restaurant under the parties' agreements for five years, from 1996 to 2001, by exercising both of the one-year extensions. In early to mid–2001, discussions began whereby the Buyer proposed delaying the closing of the asset purchase and extending the asset lease, while closing on the purchase of the real property first. No formal agreements were ever reached in this regard, however.

On August 9, 2001, the Buyer's attorney wrote to the Seller's attorney and stated the Buyer proposed purchasing the land in December and delaying closing on the business assets for another four years. He asked the Seller's attorney to "let [him] know if this is acceptable."

On August 14, 2001, the Seller's attorney responded to the Buyer's attorney and noted, "The original agreement between our respective clients has always provided that the option for the real estate could not be exercised until the business was acquired. That is still the underlying premise." The Seller's attorney then stated, "There would not be a difficulty in extending the business acquisition/leases for an agreeable period of time and, at the same time, we could also consider extending the option to purchase under mutually agreeable terms." The Seller's attorney advised that his client would be away for a few weeks and cautioned the Buyer's attorney to speak to the Buyer and get back to him soon, noting: "Please keep in mind that there are deadlines for these matters."

On August 27, 2001, the Buyer's attorney wrote to the Seller's attorney in a document entitled, "Speed Memo," about exercising the option:

This confirms our recent phone conversations. Ric [John "Rick" Peterson, one of the Investors] and his partners will exercise option on property and we would like to follow-up

2. The circuit court noted that the option language in the Restated Commercial Lease differs slightly from that used in the Sublease.

on Ric & Rogers [Rodger Keyes] recent conversation about extending remainder for 3–5 yrs.

No agreements were reached by the parties by September 1, 2001. The Buyer did not pay the earnest money deposit of $41,250.00 at any time prior to September 1, 2001 and did not close on the purchase of the business assets by that date.

By letter of September 5, 2001, the Seller's attorney advised the Buyer's attorney that the option to purchase the real property had expired on September 1, 2001. The Seller's attorney stated no notice had been received about the exercise of the option; further, since there were no extensions in the purchase date for the business assets, the closing date would be December 1, 2001 as contemplated by the parties' agreements, at which point "the Sublease would convert to a Lease." The Seller's attorney stated Rodger Keyes was out of town, so he had not had a chance to talk to him, and he (the attorney) would be leaving the country for a couple of weeks. The attorney acknowledged that there had been some discussions about extending the closing on the purchase of the business and stated there may be a possibility of extending the option under revised terms, but that the Seller's position at that time was that it was "looking to a closing of the business on December 1st, and that the option for the purchase of the real estate has expired."

The parties met again after this, but still failed to reach an agreement. On or about November 15, 2001, the Buyer tendered to the Seller the earnest money deposit of $41,250.00 required by Paragraph 22.16 of the Sublease, but the Seller returned the funds, reiterating its position that the option to purchase the real property had expired.

## C. Suit for Specific Performance

In late November 2001, the Buyer and Alexander's Land Co., L.L.C.[3], along with the individuals comprising them, brought the current action against the Seller, MMK, and Rodger Keyes seeking specific performance of the option to

---

**3.** Alexander's Land Co., L.L.C. was another entity established by the Investors. It was purportedly dismissed as a party by the circuit court during the hearing in this matter, but thereafter a judgment for attorneys' fees was entered against it.

purchase the real property. They contended the Speed Memo of August 27, 2001 was a valid exercise of the option.

The Buyer thereafter closed on the purchase of the restaurant assets from MMK on December 7, 2001. At that time, the Restated Commercial Lease was executed, so the Buyer now leases the real property directly from the Seller and continues to operate the restaurant with the assets it purchased from MMK.

After a hearing, the circuit court issued an order denying the Buyer's request for specific performance. The circuit court stated the evidence showed the Investors—Auer, Peterson, and Rossmeyer—attempted to exercise the option on behalf of the Buyer by delivering the written notice on August 27, 2001. However, the delivery of the notice, standing alone, was not sufficient to comply with the terms of the option, which required: (1) closing on the acquisition of the business assets prior to the exercise of the option, (2) delivery of the written notice, and (3) tender of the $41,250.00 earnest money deposit. The circuit court found "Auer, Peterson and Rossmeyer did not satisfy the condition precedent by actually closing on their acquisition of the Business Assets, and they did not tender the earnest money deposit along with the written notice of the [Buyer's desire to exercise the] Option."

The Court of Appeals reversed and remanded the matter for an order enforcing the option, holding that, except for failing to meet the condition precedent, the Buyer had properly exercised the option; therefore, the Seller should have given the Buyer notice of default and the right to cure the default within thirty days as contemplated by the parties' agreements. *Alexander's Land Co. v. M & M & K Corp.*, Op. No.2007–UP–364 (S.C. Ct.App. filed Aug. 29, 2007). This Court granted a petition for a writ of certiorari to review the decision of the Court of Appeals.

## II. STANDARD OF REVIEW

A suit seeking a declaratory judgment is neither legal nor equitable; rather, it is determined by the nature of the underlying issue. *Sloan v. Greenville Hosp. Sys.*, 388 S.C. 152, 694 S.E.2d 532 (2010). An action for specific performance of an option contract lies in equity. *Ingram v. Kasey's*

*Assocs.*, 340 S.C. 98, 531 S.E.2d 287 (2000). "In equity actions an appellate court can review the record and make findings based on its view of the preponderance of the evidence." *Id.* at 105, 531 S.E.2d at 290–91.

The interpretation of a contract is an action at law. *Auto Owners Ins. Co. v. Rollison*, 378 S.C. 600, 663 S.E.2d 484 (2008). In an action at law, tried without a jury, the trial court's factual findings will not be disturbed on appeal unless found to be without evidence that reasonably supports the court's findings. *Townes Assocs. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976).

## III. LAW/ANALYSIS

On appeal, the Seller [4] presents the following questions: (1) whether the Buyer properly exercised the option to purchase the real property owned by the Seller, and (2) whether the Buyer's failure to comply with the terms of the option was an "event of default" that required the Seller to give the Buyer notice of default and a right to cure its failure to comply with the terms of the option.

### A. Exercise of the Option

As indicated above, the Seller granted the Buyer an option to purchase the real property during the first and second renewal terms. Specifically, Paragraph 22.16(b) provided: "The Option must be exercised in writing not later than ninety (90) days prior to the end of the second renewal term and not earlier than ninety (90) days prior to the commencement of the first renewal term. Failure to exercise the option shall cause it to automatically expire without further action by LANDLORD [the Seller]."

Paragraph 22.16(c) further provided for the payment of a deposit: "Upon the exercise of the Option, SUBTENANT [the Buyer] shall deposit an earnest money deposit with LANDLORD in an amount equal to ... ($41,250.00) representing ... (2.5%) of the purchase price."

---

4. Both the Seller and MMK have appealed. However, for simplicity, the Seller shall be referred to as the appealing party.

The option expressly required, as a condition precedent, that the Buyer complete the purchase of MMK's business assets *before* it could exercise the option.[5] Specifically, it provided the Buyer "must have consummated the purchase of [MMK's] business, pursuant to the terms and conditions of the Asset Acquisition Agreement" and that the option could not be exercised until MMK "has received all amounts owed to it under the Asset Acquisition Agreement and the Personal Property Lease."

In denying the Buyer's request for specific performance, the circuit court ruled the Buyer's attempt to exercise the option via the August 27, 2001 Speed Memo, standing alone, was not exact compliance with the terms of the option as is required under South Carolina law. The circuit court stated the Buyer failed to satisfy the condition precedent by closing on the purchase of the business assets prior to attempting to exercise the option, and it also did not tender the earnest money along with its written notice.

In contrast, the Court of Appeals held the option was properly exercised, but for the satisfaction of the condition precedent. *Alexander's Land Co.*, slip. op. at 8. The Court of Appeals held the option did not require that the payment of the deposit be contemporaneous with the exercise of the option. *Id.* at 8. The court determined the option was "arranged as a timetable, first requiring an exercise of the option, then a deposit of earnest money, and finally a closing."[6] *Id.*

On appeal, the Seller first contends the Court of Appeals erred in finding the Buyer properly exercised the option, but for the satisfaction of the condition precedent. The Seller argues the Speed Memo of August 27, 2001 was not an unqualified exercise of the option because the Buyer stated that it "will" exercise the option, which the Seller asserts is

---

5. The circuit court noted that the reason for this provision was that if the Buyer purchased the real property and then did not close on the purchase of the business assets, then MMK would be left with the business assets, but no place to operate the restaurant.

6. The Seller's attorney testified the Buyer had to give written notice, tender the deposit, and close on the business assets, all prior to September 1, 2001.

"an equivocal statement about a future event." [7] Also, in the Speed Memo, the Buyer "again tried to negotiate a waiver of the condition precedent, despite [the] Seller's repeated refusal to do so during the preceding months." The Seller argues that, "in failing to satisfy the condition precedent before the end of the option period," the Buyer failed to strictly comply with the exact terms of the option. The Seller maintains the Buyer's attempted exercise of the option "was not the unequivocal and unconditional acceptance and performance required by South Carolina law."

In response, the Buyer maintains it properly noticed the option and that it does not believe there was a failure of a condition precedent. The Buyer argues it was required to give notice that it would purchase the real property by September 1, 2001, and then tender a deposit and be ready to close on the business assets by December 1, 2001, all of which it complied with in a timely manner. The Buyer states it understood that it was required to close on the purchase of the business assets before being allowed to close on the real property, but it had believed both closings would be held on the same day. The Buyer maintains that if there was any misunderstanding regarding these deadlines, it should have been given notice of default and a right to cure.

█ Options are contracts that generally possess the following three main characteristics:

(1) they are unilateral contracts where the optionor, for a valuable consideration, grants the optionee a right to make a contract of purchase but does not bind the optionee to do so; (2) they are continuing offers to sell, irrevocable during the option period; and (3) the transition of an option into a contract of purchase and sale can only be effected by an unqualified and unconditional acceptance of the offer in accordance with the terms and within the time specified in the option contract.

---

7. The Seller's allegation regarding the qualified nature of the Buyer's acceptance was raised in its Petition for Rehearing to the Court of Appeals, and this Court granted certiorari on this question. This Court denied certiorari on the Seller's challenge to the ruling of the Court of Appeals regarding when payment of the deposit was required, so this issue is not before us.

*Ingram,* 340 S.C. at 108, 531 S.E.2d at 292; *see also S.C. Elec. & Gas Co. v. Hartough,* 375 S.C. 541, 547, 654 S.E.2d 87, 90 (Ct.App.2007) (citing the three-part test in *Ingram* ).

■ "In equity, strict compliance with time limits contained in a contract will not ordinarily be enforced, except with regard to option contracts." *Faulkner v. Millar,* 319 S.C. 216, 220, 460 S.E.2d 378, 380 (1995) (citing *Dargan v. Page,* 222 S.C. 520, 73 S.E.2d 705 (1952)).

■ When an option is subject to a condition precedent, in addition to manifesting acceptance within the stated time, the optionee must satisfy the conditions, and the contract will not be specifically enforced until any such conditions are met. 25 Richard A. Lord, *Williston on Contracts* § 67:84 (4th ed.2002).

■ "It is well settled in South Carolina that option contracts are strictly construed in favor of the optionor and against the optionee." *Ingram,* 340 S.C. at 108, 531 S.E.2d at 292. "Furthermore, if the option requires performance in a certain manner, time is of the essence and exact compliance with the terms of the option are required." *Id.* An expired and unexercised option contract is essentially an unaccepted offer. *S.C. Dep't of Transp. v. Hood,* 381 S.C. 318, 672 S.E.2d 595 (Ct.App.2009).

The Buyer's purported exercise of the option was not in accordance with the terms mandated by the option. Although the use of the word "will" in the Buyer's notice is not fatal, we agree with the circuit court's reasoning that the option expressly required, as a condition precedent, that the Buyer actually close on the purchase of MMK's business assets, i.e., that it "consummate the purchase of [MMK's] business" and pay MMK "all amounts owed to it under the Asset Acquisition Agreement and the Personal Property Lease," *before* it had the right to exercise the option.

The Buyer's failure to meet the condition precedent of closing on the business assets clearly did not constitute proper and unequivocal compliance with the explicit terms of the option prior to the time the option expired on its face.

■ As is stated in *Ingram,* "an unqualified and unconditional acceptance of the offer in accordance with the terms and within the time specified in the option contract" is re-

quired. *Ingram*, 340 S.C. at 108, 531 S.E.2d at 292. "If a contract contains a condition precedent, that condition must either occur or it must be excused before a party's duty to perform arises." *McGill v. Moore*, 381 S.C. 179, 187, 672 S.E.2d 571, 575 (2009). "A condition precedent is an act which must occur before performance by the other party is due." *Wood v. Roy Lapidus, Inc.*, 10 Mass.App.Ct. 761, 413 N.E.2d 345, 348 n. 5 (1980).

Since the Buyer never satisfied the condition precedent, and there is no evidence that this failure was ever excused by the Seller, the Buyer was not entitled to exercise the option, and no duty arose on the part of the Seller to convey the real property. *See* 92 C.J.S. *Vendor and Purchaser* § 111 (2000) ("An option must be accepted according to its terms and if, by its terms, it prescribes certain conditions for its acceptance, such conditions must be performed while the option is still outstanding, unless they are waived or compliance is made impossible by the optioner." (footnotes omitted)); *id.* § 112 ("Ordinarily, or normally, time is of the essence of an option contract relating to land, whether or not so expressed, the optioner being bound only during the time specified for the election to accept the option." (footnotes omitted)); *Cotter v. James L. Tapp Co.*, 267 S.C. 647, 656, 230 S.E.2d 715, 719 (1976) ("[T]he courts have recognized that harsh results in option cases are necessary to further more compelling considerations of public policy. When an individual grants an option he ties up his rights and property for a specified period of time without binding the other side. For this reason he is entitled to strict compliance with time limits and other terms of the option. Thus, if the optionee fails to comply with the terms of the option, even though he may have an excuse, he must bear the responsibility and not the optionor." (citation omitted)); *cf. Kennedy v. Gardner*, 170 N.C.App. 118, 611 S.E.2d 480 (2005) (holding if a party fails to satisfy a condition precedent within the specified time for exercising an option, the right is lost and cannot be revived by the unilateral act of the party seeking to enforce the option).

## B. Default Provision

██ The Seller next contends the Court of Appeals erred in further concluding that when the Buyer failed to satisfy the

condition precedent of closing on the business, the Seller "should have given [the Buyer] notice of default and the thirty day right to cure period provided under Paragraph 16.1(f) of the Sublease." *Alexander's Restaurant Co.*, slip op. at 9–10.

In reaching its conclusion that the Buyer had a right to cure, the Court of Appeals explained, "Reading the default provisions of the Sublease indicates a clear understanding that a failure of a condition precedent would be considered a default." *Id.* at 9. The court relied upon Paragraph 22.17 of the Sublease, which provides as follows:

22.17 A material breach or default, as well as a failure of condition precedent, with respect to the obligation by any party or its assigns and guarantors to perform under this Sublease shall be a breach or default under the Asset Acquisition Agreement (**Exhibit "B"**) and Personal Property Lease (**Exhibit "C"**). A material breach or a default, as well as a failure of condition precedent, with respect by any party to perform under the Asset Acquisition Agreement or under the Personal Property Lease shall be a breach or a default under this Sublease.

The Court of Appeals noted there were only two conditions precedent mentioned in the Sublease—one in the option to purchase (Paragraph 22.16) and the other in Paragraph 2 regarding the term of the lease and renewals. *Id.* The court stated, "A failure of either condition precedent noted above is a default under the Sublease, as provided for under Paragraph 22.17 of the Sublease." *Id.*

Having found the failure of a condition precedent was a default, the Court of Appeals next found it was subject to a right to cure as referenced in Paragraph 16.1(f) of the Sublease, governing defaults by the Subtenant, i.e., the Buyer:

16.1 *Default by SUBTENANT.* Upon the occurrence of any one or more of the following events, and the expiration of the applicable period herein provided for the curing of such event, without notice, if no notice is required, or with the required notice, then there shall be an "Event of Default":

. . . .

(f) If SUBTENANT fails in the performance of any of the other covenants or conditions hereof and fails to cure

such non-performance within thirty (30) days after the receipt of written notice from TENANT specifying the nonperformance.

 "The cardinal rule of contract interpretation is to ascertain and give legal effect to the parties' intentions as determined by the contract language." *McGill,* 381 S.C. at 185, 672 S.E.2d at 574. "Where the contract's language is clear and unambiguous, the language alone determines the contract's force and effect." *Id.* "A contract is read as a whole document so that one may not create an ambiguity by pointing out a single sentence or clause." *Id.* "It is a question of law for the court whether the language of a contract is ambiguous." *Id.*

In examining the language of the default provision cited above, the pertinent language expressly refers to an "obligation . . . to perform under" the contract: "A material breach or default, as well as a failure of condition precedent, *with respect to the obligation by any party* or its assigns and guarantors *to perform under this Sublease* shall be a breach or default under the *Asset Acquisition Agreement* [ ] and *Personal Property Lease* [ ]." (Emphasis added.) Along similar lines, it states that a material breach or default, as well as the failure of a condition precedent as to an obligation under the Asset Agreement and the Personal Property Lease, shall constitute the same under the Sublease.

We find Paragraph 22.17 simply states that a material breach or default, as well as the failure of a condition precedent under the Sublease, will be considered a breach, default, or failure of condition precedent under each of the other agreements (the Asset Agreement and the Personal Property Lease), and vice versa. It is a cross-default provision that binds all three agreements by making the violation of any one agreement a violation of all three.

Moreover, the option to purchase was not a legal obligation of the Buyer to perform under any of the contracts; rather, it was a right possessed by the Buyer to purchase the real property at a certain price within a specified time frame. If the Buyer failed to proceed with the purchase for any reason, the Buyer was not in default or breach, as the Buyer had no legal obligation under the contract to purchase the real prop-

erty. Although the contract specifies a condition precedent to the *right* to exercise the option, this is distinguishable from a condition precedent *related to any obligation to perform* under the contract.

■ In *Faulkner v. Millar*, this Court noted that an option merely gives a person the right to make a purchase at a fixed price within a fixed time, but it imposes no obligation to do so:

> An option is to be distinguished from a sale, or a contract, or agreement or offer to sell. The chief difference between a contract to sell and purchase real property, and an option to purchase said property lies in the fact that, while the former creates a mutual obligation on the part of one party to sell and the other to purchase, the option merely gives the right to purchase, at a fixed price, within a fixed time, without imposing any obligation to do so.

319 S.C. at 220, 460 S.E.2d at 380 (quoting *Hutto v. Wiggins,* 175 S.C. 202, 205, 178 S.E. 869, 871 (1935)). An option limits the power of the optionor to revoke the offer, and it typically occurs where the optionee pays the optionor to keep an offer to sell open. *Id.*

The Buyer's interpretation that the failure of any condition precedent is a default focuses on a few words in the provision while ignoring the overall context of the Paragraph 22.17 and its relation to the contract as a whole. There are conditions precedent in the other agreements, so the concept is not limited to the Sublease. Paragraph 22.17 did not, as the Buyer urges, define the failure of a condition precedent as a default.

The option language expressly conflicts with the Buyer's interpretation as the option was self-extinguishing in at least two places. First, Paragraph 22.16(b) of the Sublease provided that if the Buyer did *not* exercise the option at all, it would "automatically expire without further action by" the Seller. Second, Paragraph 22.16(e) provided that if the Buyer *did* exercise the option, but then the closing did not occur within the time limit due to the fault of the Buyer, then the option would "be cancelled ... and the earnest money deposit forfeited as agreed upon liquidated damages, and there shall be no further rights or liabilities of either party with respect to the Option." Thus, under either scenario, the failure of the condi-

tion precedent was to result in termination of the purchase of the real property.

We hold no obligation to perform existed and the Buyer's failure to timely exercise the option is not a default under any of the agreements that would have triggered a cure period. Consequently, we reverse the decision of the Court of Appeals, which holds the Buyer is entitled to specific performance of the option because its failure to satisfy a condition precedent was subject to a right to cure.

## IV. CONCLUSION

Based on the foregoing, we hold the circuit court correctly determined the Buyer failed to timely exercise the option to purchase the real property. The Buyer did not issue an unequivocal acceptance that was in exact compliance with the terms of the option, particularly, the requirement that the Buyer first close on the purchase of the business assets. Thus, the Buyer did not have the right to exercise the option based on its failure to comply with the condition precedent. Further, the failure to satisfy the condition precedent is not subject to a right-to-cure period. Accordingly, we reverse the decision of the Court of Appeals.

**REVERSED.**

PLEICONES, Acting Chief Justice, KITTREDGE, J., and Acting Justices JOHN H. WALLER, JR. and E.C. BURNETT, III, concur.