493 S.E.2d 856

Henry INGRAM, Appellant,

v.

KASEY'S ASSOCIATES, A South Carolina Limited
Partnership and Roy Prescott d/b/a Remy's.
Inc. and Remy's, Inc., Respondents.

No. 2715.

Court of Appeals of South Carolina.

Heard June 3, 1997.

Decided Aug. 18, 1997.

Rehearing Denied Dec. 22, 1997.

Frank F. Pape, Jr., of McGee & Pape, Hilton Head Island, and Samuel S. Svalina, of Svalina, Richardson, & Smith, Beaufort, for appellant.

G. Richardson Wieters, Hilton Head Island; and H. Fred Kuhn, Jr., and James H. Moss, both of Moss & Kuhn, Beaufort, for respondents.

CURETON, Judge

Henry Ingram appeals from an adverse judgment on his claim for specific performance arising from his attempt to exercise an option to purchase contained within a long-term lease. We reverse and remand.

## I. FACTS

On March 1, 1984, Ingram agreed to lease property for ten years from Kasey's Associates, Ltd. (Kasey's). The lease provided for an option to purchase with the rental payments applied to the purchase price if Ingram exercised the option. An amortization schedule was attached to the lease. The option provision in the lease reads as follows:

### 2. *OPTION TO PURCHASE*

LESSEE shall have the right to purchase the PREMISES at any time during the term hereof, as is described in this paragraph; provided however, that this right shall terminate forthwith upon default of the LESSEE, as provided in Paragraph 6 hereof.

\* \* \* \* \* \*

### 6. *DEFAULT AND REMEDIES*

In the event: (a) LESSEE fails to comply with any term, provision, condition, or covenant of this lease; . . . then in any of such events, LESSEE shall be in default and LESSOR shall give LESSEE written notice of the default, together with ten (10) days thereafter to cure the default.

A restaurant known as Remy's is on the leased property. Ingram entered into an oral sublease with Roy Prescott, who operates the restaurant. Prescott paid the monthly rents throughout the term and granted Ingram the right to place video game machines in the restaurant. In the spring of 1993, Prescott and Bernard Craig [1] began negotiations to enter into a lease upon the expiration of Ingram's lease. Craig's letter at this time discussed the terms of a potential agreement and noted that "Henry [Ingram] would no longer be involved."

In late 1993, Prescott began looking for a new location as he wished to vacate the restaurant at the end of Ingram's lease. Ingram claims, however, that he believed Prescott was negotiating to purchase the property from Craig on behalf of both Ingram and Prescott. Eventually, Prescott orally agreed to buy out Ingram's interest for $40,000. However, on February 20, 1994, Prescott told Ingram he could only pay $10,000. Ingram claims he was unaware that Prescott and Craig en-

---

1. Craig is the general partner of Kasey's.

tered into an agreement on January 10, 1994 for Prescott to lease the property directly from Kasey's. The agreement states that Craig and Prescott intend to terminate Ingram's interest "voluntarily or involuntarily." Craig and Prescott testified Ingram said he would not exercise the option and Kasey's and Remy's were free to make their own arrangements.

Since Prescott's offer of $10,000 was unacceptable to Ingram, he informed Craig that he was going to exercise his option to purchase the property. Ingram wrote Craig on February 22, 1994, stating: "This will serve to advise you that I am hereby exercising my option and right to purchase the above referenced premises." The letter questioned the effect of a 1990 condemnation and asked for a correct amortization schedule. Craig responded with a letter stating that Ingram had represented he was not going to exercise the option, and Craig had relied on those representations by purchasing adjacent property and beginning renovations on Remy's. The letter demanded that Ingram pay past due rent and deposit what Craig believed to be the correct purchase price in the bank account of Kasey's before the expiration of Ingram's lease on February 28, 1994.

On February 25, 1994, Ingram responded in writing and disputed the purchase price. Ingram agreed to pay the past due rents and in fact did so before February 28. Craig responded on February 28, 1994 and demanded that Ingram deposit what Ingram believed to be the correct purchase price before the close of business that day. On March 8, 1994, Ingram wrote Craig that he was ready, willing and able to close on the sale. Craig, through his attorney, responded that he would not close because his position was that the lease required Ingram to tender the purchase price before its expiration on February 28.

In March 1994, Ingram filed suit against Kasey's, Prescott, and Remy's Inc. Ingram sought specific performance of the option to purchase and raised various other claims against the defendants. On May 16, 1994, the circuit court denied Ingram's motion for summary judgment and for a temporary restraining order. On April 27, 1995, the circuit court denied the defendants' motion for summary judgment but granted

Ingram's motion to refer the claim for specific performance to the master-in-equity. On November 13, 1995, the master ruled in favor of the defendants on Ingram's claim for specific performance and damages. Ingram appeals.

## II. SCOPE OF REVIEW

An action for specific performance is in equity. *Collier v. Green*, 244 S.C. 367, 137 S.E.2d 277 (1964). We may find facts in accordance with our own view of the preponderance of the evidence. *Townes Assoc., Ltd. v. City of Greenville*, 266 S.C. 81, 221 S.E.2d 773 (1976). However, we will not disregard the findings of the master who saw and heard the witnesses and was in a better position to judge their credibility. *Tiger, Inc. v. Fisher Agro, Inc.*, 301 S.C. 229, 391 S.E.2d 538 (1989).

## III. ACCEPTANCE OF THE OPTION

Ingram first contends the trial court erred in ruling that, in order to properly exercise the option, he had to tender the purchase price to Craig before the end of the lease's term. He contends his written notice was sufficient. We agree.

An option gives the optionee a power of acceptance "within the time and in the manner specified in the option." 1 Richard A. Lord, *Williston on Contracts* § 5:16, at 717–18 (4th ed.1990). *See also Dargan v. Page*, 222 S.C. 520, 73 S.E.2d 705 (1952). An acceptance must objectively manifest assent in a positive and unambiguous manner. 2 Richard A. Lord, *Williston on Contracts* § 6:3, 6:10 (4th ed.1990). When analyzing an attempt to accept an option, courts strictly construe, in favor of the optionor, the terms, conditions, and time limits of an option. 1 Richard A. Lord, *Williston on Contracts* § 5:18 (4th ed.1990). *See, e.g. Cotter v. James L. Tapp Co.*, 267 S.C. 647, 230 S.E.2d 715 (1976); *Edwards v. Rouse*, 290 S.C. 449, 351 S.E.2d 174 (Ct.App.1986).

We are asked to decide what is required to accept an option which reads, "LESSEE shall have the right to purchase the PREMISES at any time during the [lease's] term." Initially, we note our general agreement with the following:

[O]ptions, like other offers, call for acceptance by a promise or an act, depending on whether the main contract is to be

bilateral or unilateral. Especially in cases of options for the sale of land, most courts interpret the option as conditioned upon the giving of a promise to pay the price for the land, that is, as calling for the formation of a bilateral contract rather than for tender of the actual performance, which would be required for acceptance in a unilateral contract. This interpretation accords with the common law preference for bilateral contracts, as well as with the business need of appropriate time for arranging the necessary papers or other arrangements required to make the conveyance.

1 Richard A. Lord, *Williston on Contracts* § 5:18, 738–39 (4th ed.1990).

 The trial judge ruled the term "purchase" requires payment of the price. In *Paris Mountain Water Co. v. City of Greenville*, 105 S.C. 180, 188, 89 S.E. 669, 671 (1916), "purchase" was defined as the "transmission of property from one person to another, by their voluntary act and agreement, founded on a valuable consideration." Creating a bilateral executory contract for the sale of land is consistent with this definition, as the rights, obligations, and liabilities of the contracting parties are fixed once the contract is created.[2] Equitable title passes upon the creation of the executory contract for the sale of land. *Brooks v. Council of Co-Owners*, 315 S.C. 474, 445 S.E.2d 630 (1994).[3] Even though the purchase money has not changed hands, the contract mandates that it eventually does so.

 We thus hold that Ingram purchased the property within the term of the lease by sending written notice of

---

**2.** A contract to sell and purchase real estate mutually obligates both the seller and the buyer to complete the transaction, while an option to purchase only gives the optionee a right to purchase within a limited time and without obligation to purchase. *See Faulkner v. Millar*, 319 S.C. 216, 460 S.E.2d 378 (1995); 1 Richard A. Lord, *Williston on Contracts* § 5:16, 719 (4th ed.1990).

**3.** *Brooks* states, "the theory of equitable conversion provides that under an executory contract for the sale of real estate, the equitable estate passes to the purchaser and the bare legal title for security purposes remains in the vendor." 315 S.C. at 476, 445 S.E.2d at 632 (citing 8A George W. Thompson, *Commentaries on the Modern Law of Real Property* § 4447 (1963)).

acceptance.[4] Once Ingram gave notice, he bound himself to a bilateral and executory contract for the sale of land. At this point, Ingram promised to pay, which triggered Kasey's already existing promise to convey. Both of these obligations were required to be discharged within a reasonable time of acceptance.[5] The entry into an executory contract for the sale of land creates legal obligations sufficient to satisfy the term "purchase" contained in the lease and option.

Moreover, our holding is consistent with the result in *Conner v. Alvarez*, 285 S.C. 97, 328 S.E.2d 334 (1985). *Conner* involved a renewable "lease agreement and option to buy," which provided for an appraisal to determine the purchase price of the subject house and lot, if the option was exercised in any year other than the year of the agreement's signing. The parties disputed whether the agreement allowed rental payments to be credited against the purchase price if acceptance occurred in any year other than the year of signing. In the passage relevant to the case at bar, the court held that while a prior attempt to exercise the option was insufficient because the optionee "was [not] prepared to follow through [with] his attempt to exercise," acceptance was completed through a second letter which gave "notice of intention to exercise the option to purchase." 285 S.C. at 99–100, 328 S.E.2d at 335–36.[6]

---

**4.** Ingram's February 22 letter, which was undisputedly received by Craig, states: "This will serve to advise you that I am hereby exercising my option and right to purchase the above referenced premises." This is reasonable and unequivocal acceptance, and the fact that a dispute existed as to the amortization schedule does not affect this conclusion. An objective means existed to determine the purchase price.

**5.** While the option contract itself requires strict compliance with its time limits, "time is not of the essence of a contract to convey land unless made so by its terms expressly or by implication from the nature of the subject matter. . . . When the contract does not include a provision that time is of the essence, the law implies that [closing of the sale] is to be done within a reasonable time." *Hobgood v. Pennington*, 300 S.C. 309, 314, 387 S.E.2d 690, 693 (Ct.App.1989).

**6.** We note that the court in two other South Carolina cases, while not expressly discussing whether notice is sufficient in such an option, was asked to decide whether sufficient tender was given within the option period. In *Elliott v. Dew*, 264 S.C. 40, 212 S.E.2d 421 (1975), the plaintiff entered into a "right to purchase" option for beach property.

Of course, parties may *expressly* make the acceptance of an option contingent upon payment of all or some of the purchase price. *See* 77 Am.Jur.2d *Vendor and Purchaser* § 53 (1997) ("Where the option by its express terms requires that the payment of the purchase money or a part thereof accompany the optionee's election to exercise the option, the making or tender of the payment specified, unless waived by the optionor, is a condition precedent to the formation of a contract to sell."). However, the language in the subject option does not expressly convey such a condition for acceptance. *See Erich v. Granoff,* 109 Cal.App.3d 920, 167 Cal.Rptr. 538 (1980); *Doolittle v. Fruehauf Corp.,* 332 So.2d 107 (Fla.Dist.Ct.App. 1976); *Gulf Oil Corp. v. Ferguson,* 509 S.W.2d 1 (Mo.1974). *But see, e.g. Hilltop Development v. Miller Hill Manor Co.,* 342 N.W.2d 344 (Minn.1984) (noting that "[w]here an option contract requires a buyer to 'purchase' or 'buy' property within a specified time, courts generally require the buyer to tender payment in order to accept the offer").[7] Having held Ingram properly exercised the option, we need not address whether the right to cure provision applied to the option clause.

## IV. READY, WILLING, AND ABLE TO PERFORM

Ingram first contends the trial court erred in finding Kasey's was capable of conveying good marketable title on the last day of the lease's term. He argues that: (1) Kasey's was

---

The court addressed the issue of whether the plaintiff's attempt to tender the purchase price within the time period was sufficient for specific performance. In *Parks v. Lyons,* 219 S.C. 40, 64 S.E.2d 123 (1951), the court held that a minor plaintiff, who received a written option to purchase, was not ready, willing, and able to tender within the time period, despite repudiation by the defendant, because the minor lacked financing. *Cf. also Lindler v. Adcock,* 250 S.C. 383, 158 S.E.2d 192 (1967) (no acceptance of offer because optionee neither handed optionor a check nor offered to give a check).

7. The Williston rule, coupled with our interpretation of "purchase" as satisfied by a promise and not just an act, provides the proper rule in view of business and commercial realities in the sale of land. The normal course is that a bilateral contract of sale is the first step in the sale of land. If parties wish to operate outside of this normal practice, they must be explicit in their intent to do so. *Cf. Cotter v. James L. Tapp Co.,* 267 S.C. 647, 230 S.E.2d 715 (1976) (interpreting an option which specifically required payment for renewal).

threatening suit, (2) a dispute as to the purchase price existed and Kasey's own expert testified he would not issue title insurance due to this potential lien, (3) Kasey's was unable to deliver the entire parcel due to condemnation of a minor portion of the leased property, and (4) Kasey's had secretly agreed to lease the property to Prescott.

We initially note that in the absence of a contractual provision indicating the character of the title, the vendor impliedly undertakes to give good and marketable title. 77 Am.Jur.2d *Vendor and Purchaser* § 123 (1997). Under our view, Ingram's acceptance created a bilateral contract with the closing to occur within a reasonable time. Thus, it is not relevant whether the vendor's title was free and clear at the end of the lease, but whether it was marketable at the time for closing. 77 Am.Jur.2d *Vendor and Purchaser* § 195, 233 (1997). Title is unmarketable if there is a "reasonable probability of litigation." *Sales Int'l Ltd. v. Black River Farms, Inc.*, 270 S.C. 391, 242 S.E.2d 432 (1978).

## A. Dispute over Purchase Price

The dispute between the vendor and the purchaser over the amortization schedule, as well as the threat of litigation surrounding the vendor and purchaser's transactions, do not affect the marketability of the title as between those parties. Those issues necessarily will be resolved if title passes. *See* 77 Am.Jur.2d *Vendor and Purchaser* § 139 (1997).

## B. Condemnation During Pendency of Option

A few years prior to the lease's expiration, the South Carolina Department of Highways and Public Transportation paid Craig $15,000 after condemning a small portion of the property in order to widen the adjacent road by a few feet. The condemnation resulted in a loss of two parking spaces, and Prescott paid to relocate the entrance to the restaurant. Ingram claims on appeal that the condemnation prevents Kasey's from giving marketable title to all of the property subject to the option, and he contends that the purchase price should be accordingly reduced in the amount of the condemnation award. Kasey's contends Ingram waived or is estopped

from claiming any portion of the condemnation award or any reduction of the purchase price, because Ingram did not take any action even though Craig specifically informed Ingram at the time of condemnation that Ingram should protect his own interest.

Initially, we hold that a lessee with an option to purchase, in which the rental payments reduce the purchase price, has a compensable interest in the option for purposes of condemnation. *Cf. Gray v. South Carolina Dep't of Highways & Pub. Transp.*, 311 S.C. 144, 427 S.E.2d 899 (Ct.App.1992) (option to renew a lease is compensable). *See Texaco, Inc. v. Commissioner of Transp.*, 34 Conn.Supp. 194, 383 A.2d 1060 (1977) (damages for unexercised option to purchase is difference between condemnation award and option purchase price); *State v. Jan–Mar Inc.*, 210 N.J.Super. 236, 509 A.2d 310 (N.J.Super.Law Div.1985) (lessee/optionee cannot recover both value of leasehold as well as difference between option price and award). However, we also agree that, where equitable, a vendee can specifically enforce his exercise of an option even though a portion of the subject property was condemned for public use during the pendency of the option but before its exercise. In such a case, the vendee is entitled to a credit of the condemnation award against the purchase price. *See, e.g. Wilcox v. Wyandotte World–Wide, Inc.*, 208 Kan. 563, 493 P.2d 251 (1972); *Cullen & Vaughn Co. v. Bender Co.*, 122 Ohio St. 82, 170 N.E. 633 (1930). *See generally* 71 Am.Jur.2d *Specific Performance* § 129 (1973); 77 Am.Jur.2d *Vendor and Purchaser* § 128 (1997). The question thus becomes whether Ingram's failure to do anything at the condemnation stage operates to prevent him from seeking abatement of the purchase price in a subsequent suit for specific performance.

We hold Ingram may seek abatement of the purchase price despite his failure to seek compensation for the condemnation. The Eminent Domain Procedure Act does provide for a separate proceeding in equity to apportion a condemnation award, "[u]nless the persons served with the Condemnation Notice agree in writing as to whom just compensation must be made and paid." S.C.Code Ann. § 28–2–460 (Rev.1991).[8] *Cf.*

---

8. Condemnees are defined as those with a record interest in or actual possession of the subject property. Landowners are condemnees with

*Hamilton v. Martin,* 270 S.C. 223, 241 S.E.2d 569 (1978). However, regardless of whether Ingram should or could have sought compensation at the condemnation stage, it would be inconsistent with principles of equity to grant specific performance but require full payment for less than the whole.

In the present case, Ingram testified Craig told him the purchase price would be reduced by the amount of the condemnation award. Craig testified that after he informed Ingram of the pending condemnation, Ingram looked into the matter and eventually informed Craig of his lack of interest in the award. The trial judge rejected on reconsideration Ingram's contention that he was entitled to the condemnation award if specific performance was decreed. We elect to remand the issue of abatement to the trial court for determination. Although we may find facts in this case in accordance with our own view of the evidence, whether it would be equitable to allow an abatement of the purchase price involves credibility determinations which are more appropriate for the trial court.[9]

### C. Kasey's and Prescott's Subsequent Lease

An outstanding lease constitutes an encumbrance upon the land to be sold. 77 Am.Jur.2d *Vendor and Purchaser* § 199 (1997). It is also a general rule that if a purchaser was made aware of and purchased with knowledge of an

---

record fee simple interest. S.C.Code Ann. § 28–2–30(6), (12) (Rev. 1991). This procedure "contemplates that the landowner, and not other condemnees, is the interested party in most phases of the action. Thus, the landowner alone is [ordinarily] served with the condemnation notice and accepts or rejects the tender or challenges the right to condemn, is served with the condemnor's election to proceed with trial, and consents to abandonment of the action." 18 S.C.Juris. *Eminent Domain* § 44, p52 (1993). The record is unclear as to the extent of Ingram's involvement with any proceedings that took place.

9. We recognize that the lease provided, "any award payable by reason of condemnation of the leased property by public authority shall be paid to LESSOR, except as the same may relate to specific property of LESSEE." We concur with the respondents that the parties may freely agree as to the effect a condemnation may have on an option to purchase within a lease. However, we find the provision only addresses payment of the condemnation award, and does not affect the question of whether Ingram is entitled to an abatement of the purchase price.

outstanding leasehold, the title is marketable. *Id.* However, the latter rule is not applicable to the present case. Although it is true that the contract, and thus purchase, was not consummated until Ingram's acceptance, an optionor cannot vary the terms of the option during its pendency. *Eberly v. Gutentag & Son,* 28 Ohio App. 102, 162 N.E. 619 (1927) (an optionor cannot dispose "of the property under consideration until the expiration thereof"), *cited in* 1 Richard A. Lord, *Williston on Contracts* § 5:16, 720 (4th ed.1990). However, Kasey's raises claims of waiver and estoppel, because it contends Ingram represented he was not going to exercise his option. Ingram, on the other hand, testified he told Craig he would forego exercising the option only if he and Prescott came to a satisfactory agreement as to Prescott's purchase of Ingram's interest. The master made no express finding on estoppel and struck from his original order a finding that Ingram represented he would not exercise the option. Since we have held Ingram properly exercised his option, we remand to the trial court for a ruling on Kasey's estoppel and waiver claims. *Cf. Edwards v. Rouse,* 290 S.C. 449, 351 S.E.2d 174 (Ct.App.1986) (waiver); *Davenport v. Miller,* 218 S.C. 56, 61 S.E.2d 534 (1950) (estoppel). If Ingram is not estopped or did not waive his rights, the trial court shall determine any effect the new lease may have on the option to purchase and Ingram's rights.[10] *Cf.* 71 Am.Jur.2d *Specific Performance* § 146 (1973) (citing *Abdallah v. Abdallah,* 359 F.2d 170 (3rd Cir.1966)); 77 Am.Jur.2d *Vendor and Purchaser* § 199 (1997).

### D. Ingram's Sources of Funds

Ingram claims the trial judge erred in failing to find he was able to raise sufficient funds to comply with the option within a reasonable time. A party seeking specific performance must be ready, willing, and able to perform in order for the court to grant him relief. *Cf. Parks v. Lyons,*

---

**10.** The new lease was dated March 1, 1994; if Ingram is not estopped, Kasey's had no right at that time to dispose of the property due to its obligations under the executory contract for sale. However, Kasey's and Prescott also entered into a written agreement on January 10, 1994. Craig testified the January agreement's language meant that if Ingram exercised his option, Kasey's agreement with Prescott would be "off."

219 S.C. 40, 64 S.E.2d 123 (1951). Ingram testified he did not have the money at the end of the lease term, but that he had arranged to get the money from various sources on short notice. Most of Ingram's sources for funds testified that money had not changed hands and specific loan terms had not been discussed. By mid–1994, Ingram also secured a loan from an individual who had a commitment from a bank. However, one of Ingram's sources said his affidavit was a "hoax" and he had not agreed to loan any money. The trial court expressly limited its determination to whether Ingram could comply as of the termination date of the lease. We remand for the trial judge to determine, if necessary, whether Ingram was ready, able, and willing to perform within a reasonable time of acceptance of the offer and formation of the contract for sale. Again, while we may find facts in accordance with our own view of the preponderance of the evidence, we elect to remand this issue inasmuch as there are serious credibility issues to be determined.[11]

11. As best as we can discern, Ingram testified at trial that one of his potential sources for funds was Billy Tysinger. Kasey's called Tysinger as a witness. Tysinger testified he had neither funds for nor an agreement to loan Ingram $100,000. Tysinger characterized an affidavit he signed for Ingram as a "hoax." The trial judge initially agreed with Ingram's objection that Kasey's was impermissibly attempting to impeach Ingram with a collateral matter, because Ingram's attorney claimed Ingram "abandoned" the assertion that Tysinger was a potential lender. The respondents argued Tysinger's testimony was relevant to the defense of unclean hands. While the trial judge did not expressly address unclean hands in the order, he did discuss Tysinger's testimony while making findings relevant to Ingram's claims of sufficient access to money. On appeal, Ingram asserts Tysinger's testimony should not have been considered because it is either improper impeachment or impermissible character evidence.

The doctrine of "unclean hands" precludes a plaintiff from recovering in equity if he acted unfairly in a matter that is the subject of the litigation to the prejudice of the defendant. *Arnold v. City of Spartanburg*, 201 S.C. 523, 532, 23 S.E.2d 735, 738 (1943). Moreover, the decision to grant equitable relief is within the discretion of the trial court, especially when allegations of "unclean hands" involve a fraud upon the court in which relief is sought. *See, e.g. Zinda v. Krause*, 191 Wis.2d 154, 528 N.W.2d 55 (App.1995). Without deciding the issue, we consider Tysinger's testimony directly relevant to the respondents' claim of "unclean hands." *Cf. Jamison v. Howard*, 275 S.C. 344, 271 S.E.2d 116 (1980) (evidence may be admissible for one purpose and inadmissible for other purposes). If necessary, the trial court should

## V. DEFAULT FOR UNPAID RENT

Ingram claims the trial court erred in finding that he was in default for unpaid rent when he exercised the option. We agree. Both Ingram and Craig testified Ingram paid the rent due upon notice of default. Ingram noted he had been told Craig waived Prescott's payment of the rent in question. The lease provided for a right to cure. We find that if Ingram was in default, he cured it prior to his exercise of the option.

## VI. DAMAGES

Finally, Ingram contends the master erred in failing to find he suffered special damages from lost profits, lost rents, and lost video machine income. Since we have remanded other issues to the trial court, we also remand for a determination of any recoverable damages should the trial court conclude Ingram is entitled to specific performance. *Cf. White v. Felkel,* 225 S.C. 453, 82 S.E.2d 813 (1954); *Windham v. Honeycutt,* 290 S.C. 60, 348 S.E.2d 185 (Ct.App.1986).

## VII. CONCLUSION

We conclude Ingram properly exercised the option to purchase by written notice within the option's time period. We remand for a determination on estoppel, waiver, abatement of the purchase price, Ingram's ability to close within a reasonable time, and unclean hands. If Ingram is entitled to specific performance, the trial court shall determine any appropriate damages.

**REVERSED AND REMANDED.**

HEARN and STILWELL, JJ., concur.

---

determine on remand whether Ingram's misconduct, if it occurred, affects his claim for specific performance.