947 So.2d 464 (2006)
Dania MUÑIZ and Arturo A. Chao, Appellants,
v.
CRYSTAL LAKE PROJECT, LLC, Appellee.
No. 3D05-1997.
District Court of Appeal of Florida, Third District.
October 25, 2006.
*466 Arnaldo Velez, Coral Gables, for appellants.
G. Richard Strafer, for appellee.
Before COPE, C.J., and FLETCHER and ROTHENBERG, JJ.
ROTHENBERG, Judge.
The plaintiffs, Dania Muñiz and Arturo A. Chao ("Purchasers"), appeal a final judgment denying their claim for specific performance of a contract to convey land entered into with the defendant, Crystal Lake Project, LLC ("Seller"). The Seller cross-appeals the denial of its counterclaim against the Purchasers for breach of contract. We reverse in part, affirm in part, and remand for further proceedings.
On February 1, 2003, the Purchasers visited the Seller's sales office and were attended by one of the Seller's sales representatives, *467 Benjamin Cimino ("Mr. Cimino"). Mr. Cimino gave the Purchasers brochures depicting various model homes for sale by the Seller. The Purchasers decided to purchase one of the models in the brochures, the "Vizcaya" model, and entered into negotiations with Mr. Cimino regarding the items to be included in the structure to be built by the Seller. Mr. Cimino prepared a purchase and sale agreement for the Vizcaya model with a total purchase price of $269,990.00 ("Agreement"). Mr. Cimino made two copies of the unexecuted Agreement, added to each of the copies hand-written notations indicating additional options to be included in the structure, and gave both copies to the Purchasers for their respective signatures.
The Purchasers executed both copies of the Agreement and simultaneously made a separate list of additional items they believed were to be included on the subject property. The Purchasers gave this additional option list to Mr. Cimino. This list, however, was never added to nor incorporated by reference into either copy of the Agreement. After executing both copies of the Agreement, the Purchasers retained one copy and Mr. Cimino retained the other copy for transmittal to the Seller for signature by the Seller's authorized officer. The Seller's authorized officer ultimately executed the second copy. Although the Purchasers on numerous occasions requested a fully executed copy of the Agreement, it was not provided to them.[1]
The copy of the Agreement retained by the Purchasers and not signed by the Seller's authorized officer, includes hand-written notations to include the following options in the structure: crown molding; washer and dryer; tub enclosure on the second bathroom upper level; and ceramic tile in all areas except the bedroom. The copy of the Agreement executed by the Seller's authorized officer contained all of the hand-written notations except for the notation "ceramic tile all area but bedroom."
Construction of the structure on the property commenced soon thereafter. During late 2003 to early 2004, the Purchasers noticed that the structure was not being built according to their expectations and pursuant to the hand-written notations on the Agreement or the additional option list. The Purchasers consequently went to the Miami-Dade County Building and Zoning Department ("County") to review the plans that had been approved for the subject property. Realizing that the construction of the structure was not in accordance with the building plans nor with their expectations under the Agreement, the Purchasers reported the Seller to the County. A code compliance officer for the County visited the construction site and ordered corrections to be made to the plans. The Seller thereby made corrections to the building plans.
On February 9, 2004, more than a year after execution of the Agreement and after commencement of construction on the subject structure, the Seller's attorney, Gilbert Contreras ("Mr. Contreras"), wrote the Purchasers a letter stating that they *468 were in default of the Agreement due to the Purchasers' improper and unauthorized entry onto the construction premises. Along with the termination letter, Mr. Contreras sent the Purchasers a check in the amount of their deposit money. The Purchasers have never cashed this check.
On March 12, 2004, the Purchasers filed a complaint for specific performance demanding that the Seller convey the property to them as per the terms of the Agreement and concurrently filed a Notice of Lis Pendens.
During the pendency of the litigation, the Seller received a certificate of occupancy for the subject property. Although the Seller had informed the Purchasers of its intent to terminate the Agreement on February 9, 2004, the Seller nonetheless, on June 18, 2004, sent notice to the Purchasers that a certificate of occupancy had been issued on the subject property, and offered a "walk-through" inspection for June 25, 2004 with closing to follow.
The Purchasers attended the "walk-through" inspection, prepared extensive notes on the items they felt were missing from the structure, and proceeded to the scheduled closing. The Purchasers attended the closing with cash in hand, the required financing in place, and indicated their willingness to close on the subject property despite the notations on the "walk-through punch list." The Seller, however, notified the Purchasers for the first time, that a necessary condition to proceeding with the closing was that the Purchasers dismiss the pending lawsuit with prejudice and dissolve the lis pendens. Although the Purchasers agreed to dismiss the lawsuit without prejudice and dissolve the lis pendens, the Seller refused to close pursuant to its alleged inability to convey marketable title unless the lawsuit was dismissed with prejudice. The Purchasers refused to dismiss the lawsuit with prejudice and consequently the sale transaction was not consummated.
Ultimately, the lawsuit was tried non-jury, and the trial court entered a final judgment denying the Purchasers' request for specific performance finding (1) that at the time the action was commenced, the structure was only partially completed and the sale of an incompletely constructed home was not what the parties contracted for; and (2) that because the terms of the Agreement were not clear, definite, certain and complete in all of their essential terms, specific performance of the Agreement was not warranted. The trial court further found that the lis pendens statutorily expired on March 12, 2005 per section 48.23, Florida Statutes.[2] As to the Seller's counterclaim for breach of contract, the trial court denied the claim, specifying that the Seller could not invoke a benefit under a contract that it had declared terminated and cancelled. The trial court reserved jurisdiction to award attorneys' fees and costs upon proper notice and motion.
The Purchasers appeal the denial of their claim for specific performance, arguing that the trial court abused its discretion in refusing to grant specific performance as the structure was substantially built at the time the lawsuit was commenced and completed by the time of trial. The Purchasers further argue that the trial court abused its discretion in denying specific performance of a contract that was clear, definite, certain, and complete in all *469 of its essential terms. We agree with the Purchasers that the trial court abused its discretion in denying their claim for specific performance.
The decision whether to grant or withhold a judgment for specific performance is a matter within the sound discretion of the trial court which will not be disturbed on appeal unless clearly erroneous. Henderson Dev. Co. v. Gerrits, 340 So.2d 1205, 1206 (Fla. 3d DCA 1976). The exercise of this discretion by the trial court, however, must be legally sound and not arbitrary. Humphrys v. Jarrell, 104 So.2d 404, 410 (Fla. 2d DCA 1958). "[T]he right to exercise this judicial discretion does not extend to the power or authority to contravene the legal requirements which must exist to give a litigant grounds upon which he may invoke the remedy." Castigliano v. O'Connor, 911 So.2d 145, 148 (Fla. 3d DCA 2005)(quoting Howard Cole & Co., Inc. v. Williams, 157 Fla. 851, 27 So.2d 352, 356 (1946)). Thus, "if it appears on appeal that the principles of equity justify specific performance, and no provision of law would be violated by enforcing specific performance, a decree refusing such relief may be reversed." Witham v. Shepard, 84 Fla. 75, 92 So. 685, 685 (1922). Equity sometimes "requires us to order that something be done which is just and equitable. Put differently, it is the maxim `equity will do what ought to be done.'" Demorizi v. Demorizi, 851 So.2d 243, 246 (Fla. 3d DCA 2003).
The interpretation of a contract involves a pure question of law for which this court applies a de novo standard of review. Kissman v. Panizzi, 891 So.2d 1147, 1149 (Fla. 4th DCA 2005). In order for a court to grant specific performance, the parties must have entered into an agreement that is definite, certain, and complete in all of its essential terms. Bay Club, Inc. v. Brickell Bay Club, Inc., 293 So.2d 137, 138 (Fla. 3d DCA 1974); see also 330 Michigan Ave., Inc. v. Cambridge Hotel, Inc., 183 So.2d 725, 726-27 (Fla. 3d DCA 1966)("Specific performance will not be enforced where the contract is not definite and certain as to essential terms and provisions and is incapable of being made so by the aid of legal presumption or evidence of established customs.").
In the instant case, the trial court found that the testimony and evidence failed to meet this standard in light of the conflicting versions of the Agreement and the discrepancies relating to the Purchasers' additional option list. We disagree.
We note that the trial court itself granted the Purchasers' ore tenus motion to adopt the fully executed copy of the Agreement as the actual purchase and sale agreement between the parties. Thus, there are no conflicting versions of the parties' agreement. A review of the fully executed Agreement reflects that it is definite, certain, and complete as to the parties, the description of the property, the contract price, and the financing terms thereof. See Reed v. Howell, 96 Fla. 426, 118 So. 208, 208 (1928)(holding that in order to grant specific performance of a land contract, the contract must sufficiently describe the land and the parties to the agreement); see also Aerojet-General Corp. v. Kirk, 318 F.Supp. 55, 65 (N.D.Fla.1970)(specifying that in order to grant specific performance of a contract for the sale of land, the contract must be certain and definite as to (1) the description of the property to be conveyed; (2) the purchase price; and (3) the time and terms of payment of the purchase price (applying Florida law)).
The Agreement specifies that "the Seller agrees to sell, and the Purchaser[s] agree[ ] to purchase, that certain parcel of real property legally described as Unit 4, Block 1 of BALANI SUBDIVISION, according *470 to the plat thereof, as recorded in the Public Records of Miami-Dade County[,] Florida. . . ." The Agreement further specifies the purchase price of the property, the deposit money schedule, the mortgage amount to be obtained by the Purchasers, the mortgage financing conditions, and the ability of the Purchasers to obtain options and upgrades at an additional cost.
As to the conflicting versions of the Purchasers' additional option list, the Agreement specifically states that for purposes of the options and upgrades, "[a]t the time that the Purchaser[s] select[ ] the [o]ption or [u]pgrade the Seller and the Purchaser[s] shall execute an Option and Upgrade Agreement establishing the terms and conditions of the Purchaser[s'] selections. The Option and Upgrade Agreement shall be incorporated into this Agreement." As the "Option and Upgrade Agreement" was not fully executed by both parties as per the terms of the Agreement, nor was it incorporated by reference thereto, it does not form part of the Agreement and consequently, there are no discrepancies relating to the Purchasers' additional option list. As the essential terms of the Agreement are clear and definite, we conclude that the Purchasers are entitled to a decree of specific performance.[3]
The Seller argues by way of its counterclaim, that the Purchasers are not entitled to specific performance of the Agreement as the Purchasers breached the Agreement (1) by repeatedly trespassing onto the property without written permission from the Seller and (2) by refusing to dismiss their complaint with prejudice, which the Seller claims precluded closing.
A party who fails to comply with his or her contractual commitments is generally not entitled to require the other party to specifically perform the contract, unless noncompliance was excused or waived. Free v. Free, 936 So.2d 699 (Fla. 5th DCA 2006). Regarding the first claim of noncompliance (that the Purchasers trespassed on the property), we conclude that the Seller waived any noncompliance or breach by the Purchasers by obtaining a certificate of occupancy on the subject property, notifying the Purchasers of the receipt thereof, and scheduling a "walk-through" inspection of the subject property to be followed by the closing on June 25, 2004.
We are equally unpersuaded by the Seller's second contention, that the Purchasers breached the Agreement by failing to dismiss their complaint with prejudice, as the Agreement does not impose such a requirement. The Seller unilaterally inserted this additional condition into the Agreement at the eleventh hour giving the Purchasers no opportunity to receive their benefit of the bargain as contemplated at the time the Agreement was executed. Consequently, we conclude that the Purchasers did not breach the Agreement by refusing to dismiss the lawsuit with prejudice.
The Seller argued below that its title company and the title insurance underwriter refused to issue a title policy on the *471 subject property because in refusing to issue the title policy they were protecting the mortgagee bank's lien priority and the Purchasers' interest in the title. However, the record indicates that the Purchasers' mortgagee bank was aware of the pending lawsuit between the Purchasers and the Seller and that it nonetheless provided the required financing to the Purchasers. Thus, any alleged concern the Seller may have as to protecting the Purchasers' mortgagee bank is refuted by the fact that the Purchasers received the required financing and showed up to the closing ready, willing, and able to close on the property.
It also seems disingenuous to us that the Seller in not issuing the title policy argues that it is attempting to protect the mortgagee bank and the Purchasers' interest in the title. The Agreement itself specifies on numerous occasions that "Purchaser[s] understand[ ] that, pursuant to this Agreement, the Property is to be purchased on an all cash basis and that Purchaser[s'] obligations hereunder are not contingent in any fashion upon Purchaser[s] obtaining financing, nor any conditions imposed by such financing. . . ." Regardless of whether the Purchasers' mortgagee bank provided the required financing or not, the Purchasers had an obligation to close on the subject property or be considered in default. Clearly, at the time the Seller drafted the Agreement and at the time the parties entered into the Agreement, the Seller had no concern for the mortgagee bank or the Purchasers' interest in the title as the closing was not "contingent, in any way, upon [the Purchasers] obtaining mortgage financing." If the Seller really was so concerned about protecting the mortgagee bank and the Purchasers' interest in the title, then the Seller should have contacted the Purchasers prior to scheduling the closing in order to allow the Purchasers to seek legal advice on whether or not the pending lawsuit created a problem for the required financing and the title policy. The Seller, however, did not do so and only at the eleventh hour unreasonably refused to close on the property even though the Purchasers arrived at the scheduled closing with cash in hand and the required financing in place.
The Seller has failed to provide any law that a mortgagee bank does not have priority to the property over the purchaser when it provides financing to the purchaser who is involved in a lawsuit with the seller. Nor has the Seller provided any case law establishing that a pending lawsuit between a purchaser and a seller creates a problem in the title passing between those particular parties. Our review of the case law, however, indicates the contrary result as any "lien" the purchaser may have on the property because of his or her lawsuit with the seller is automatically resolved when the title passes.
The record further reflects that the Seller's title company would not issue the title policy because the pending lawsuit and the lis pendens on the property rendered the title of the subject property unmarketable. However, as already noted, the notice of lis pendens statutorily expired on March 12, 2005, and is therefore, a non-issue. As to the pending lawsuit between the Purchasers and the Seller, we conclude that it does not render the title to the subject property unmarketable.
Florida case law specifies that pendency of litigation initiated by a third party seeking specific performance of a pre-existing contract for sale of property renders the seller's title unmarketable. Chafetz v. Price, 385 So.2d 104, 105-06 (Fla. 3d DCA 1980). In order for the title on the property to become marketable, that third party must dismiss the specific performance lawsuit with prejudice. Id. at *472 106. Florida case law, however, is silent on whether pending litigation between the seller and the purchaser must be dismissed with prejudice in order to render the title on the subject property marketable.
Other jurisdictions have held that a dispute between a seller and a purchaser, as well as the threat of future litigation between that same seller and purchaser, does not affect the marketability of the title as between those particular parties. The marketability of title between a seller and purchaser is necessarily resolved if title passes. Ingram v. Kasey's Assocs., 328 S.C. 399, 493 S.E.2d 856, 862 (Ct.App.1997), rev'd on other grounds, 340 S.C. 98, 531 S.E.2d 287 (2000); see also Bart v. Wysocki, 558 So.2d 1326, 1329 (La.Ct.App.1990)("Title is deemed unmerchantable only when there are outstanding rights in a third person of a substantial nature against the property, subjecting the vendee to serious litigation."); Langford Land Co. v. Dietzgen Corp., 352 So.2d 386, 388 (La.Ct.App.1977)(holding that, in seeking to establish that title is unmerchantable, "one must show that third persons (not parties to the action) might thereafter make claims of a substantial nature against the property, and thereby subject the vendee to serious litigation"). We adopt this view and hold that a dispute between the seller and the purchaser, as well as the threat of litigation relating to the seller and purchaser's transactions, does not affect the marketability of title between those particular parties. Consequently, in this case, as the instant litigation does not involve a third party, we conclude that the current dispute or any potential litigation between the Purchasers and the Seller does not affect the marketability of title to the specific property at issue.
Accordingly, we affirm the trial court's denial of the counterclaim based upon our conclusions that (1) the Seller waived any noncompliance or breach by the Purchasers resulting from the Purchasers' unauthorized trespass onto the subject property, and (2) the Purchasers did not breach the Agreement by refusing to dismiss the lawsuit and lis pendens with prejudice.
We further find that although both parties have continuously demanded their respective attorneys' fees and costs throughout the proceedings, and although the trial court reserved jurisdiction to award attorneys' fees and costs, neither party is entitled to attorneys' fees or costs. The Agreement between the parties specifically states that "[e]ach of the parties shall be liable for payment of their respective attorneys' fees, including attorneys' fees at appellate proceedings, and costs incurred by each party by virtue of any litigation brought pursuant to this Agreement." Thus, each party is to bear its own attorneys' fees and costs.
Accordingly, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.
NOTES
[1] Because the Purchasers never received an executed copy of the Agreement until after the lawsuit was commenced, they were unable to attach a fully executed copy thereof to their original complaint. Apparently, it was not until close to trial that the Purchasers were able to obtain the fully executed version. Purchasers thus moved ore tenus during trial to adopt the fully executed copy as the purchase and sale agreement for purposes of their specific performance claim. The trial court granted the ore tenus motion and thus, this fully executed copy of the Agreement is the version that constitutes the binding contract between the parties.
[2] The trial court correctly found that the Notice of Lis Pendens in this case expired on March 12, 2005. See § 48.23(2), Fla. Stat. (2004)("No notice of lis pendens is effectual for any purpose beyond 1 year from the commencement of the action unless the relief sought is disclosed by the initial pleading to be founded on a duly recorded instrument . . . except when the court extends the time on reasonable notice and for good cause.").
[3] The Seller attempts to emphasize on numerous occasions that the Purchasers, by not filing a claim for breach or anticipatory breach of the contract and only suing for specific performance of the Agreement, placed the trial court in an "untenable" position. However, the Agreement drafted by the Seller specifies that in the event of default by the Seller, the Purchasers are limited to (1) a return of the deposits made or (2) specific performance of the Seller's obligation to substantially complete the building structure. Thus, it seems to us "untenable" that Seller, as the drafter of the Agreement, would even attempt to argue this position as a breach of contract claim is not available to the Purchasers under the Agreement.