SALTER, J.
 

 AIC Trading Corp. appeals an amended final judgment entered following a non-jury trial. The question before us is in contention all too often in Florida real estate transactions: is a purchase option agreement executed by a landlord (appel-lees, the Susmans) and tenant (AIC) contemporaneously with a commercial lease binding and enforceable, or is it merely a preliminary and unenforceable summary of some, but not all, terms? The trial court concluded that the option agreement was unenforceable. We reverse and remand, finding that as a matter of law the option contained sufficient essential terms to be enforceable.
 

 Typically we are reluctant to reverse a trial court’s conclusions regarding such a dispute. That deference is overcome here by the clear details and intentions expressed in the written lease and option agreements, and by the landlord’s initial written admission acknowledging the tenant’s exercise of its right to purchase. This was followed, unfortunately, by the landlord’s decision to “lawyer up” and make a 180-degree change in position — a decision transparently based on the intervening and substantial increase in the value of the property over the three years between the landlord’s promise and required performance.
 

 Facts and Course of Proceedings
 

 The landlord and AIC signed two written agreements on May 13, 2002 relating to a 15,000 square foot warehouse in Miami. The trial court found, and we agree, that the eleven-page “business lease” and the two-page “lease purchase agreement” were part of the same transaction.
 
 [1]
 
 The subject property is a commercial warehouse near Miami International Airport, and the parties specifically agreed that it comprised 15,000 square feet.
 
 [2]
 
 The rent was set for the first year at $5.50 per square foot, and the purchase price was set initially at $63.00 per square foot. The rental rate was to increase by 3% per year, and the option price by 1% per year, after the first year (though the option price was capped at $66.00 per square foot). The lease purchase agreement specified the “window to purchase” during which any exercise of the option would be communicated to the landlord. Upon notification of exercise by the tenant, paragraph 11 of the purchase agreement obligated the landlord to:
 

 prepare condominium documents and all related paperwork in order to separate the buildings located at 8000-8020 NW 33rd St. and deliver to purchaser 8020 NW 33rd street in fee simple form. [Landlord/appellees] will assume the first mortgage in the amount specified less the down payment of 15% for a 15-year term at 8% interest on the principle [sic] balance amount. If these terms
 
 *771
 
 and conditions are correct as originally discussed then [tenant/AIC] shall approve the lease contract and [landlord] shall send to their attorney this purchase agreement for final clarification for [landlord and tenant]. Upon notification to purchase by [tenant], the lease agreement shall become terminated at closing.
 

 As noted, AIC did “approve the lease contract” when both parties signed it, and during the next three years there was no further “clarification” by anyone, including any attorney. Rather, AIC merely paid, and the appellees accepted, the monthly rental amount.
 

 On June 30, 2005, a date within the specified window for notice of an exercise of the purchase option, AIC delivered to the landlord a written notice of exercise. In addition to the traditional language exercising the option, AIC’s notice letter included a request for delivery of the condominium documents necessary for closing: “As soon as you have the condominium documents ready, let us know so we could study them and send them to our attorney.”
 

 On July 13, 2005, the landlord responded to AIC by letter. Though acknowledging receipt of AIC’s exercise letter, the landlord referred to “your presently leased space of 15,153.5 square feet.” That number of square feet was not the figure uniformly used in the lease, the purchase agreement, -or the rent calculations. The landlord’s letter did acknowledge that the purchase price was 15% cash, 85% purchase money mortgage amortized over 15 years with monthly payments.
 
 [3]
 
 The landlord’s letter also addressed the question of closing costs: “All closing costs shall be as ordinary and customary as to both parties.”
 
 [4]
 

 Finally, the landlord’s letter included an attachment comparing AIC’s “current monthly expenses” paid as tenant to “approximate expenses of condo ownership” including the mortgage principal and interest, condominium expenses, property taxes, and insurance. Unsurprisingly, AIC’s monthly expenses were projected to increase 35% as a result of the purchase. The summary is either an unusual attempt by a commercial landlord to assist its tenant with the tenant’s business decision or a transparent expression of seller’s remorse.
 

 Two days later, the landlord sent a second letter to AIC stating that the bank holding the existing first mortgage on both warehouses (including the one AIC leased and sought to purchase) would require numerous documents
 
 [5]
 
 from AIC to consider
 
 *772
 
 assumption of the bank’s mortgage. This was inconsistent with the lease purchase agreement, which expressly required the landlord to provide a purchase money first mortgage for 85% of the purchase price at 8% per annum over a 15-year term.
 

 Thereafter, the landlord refused to proceed with preparation of the condominium documents or any other preparation for closing. AIC retained an attorney, who began discussions with the landlord about the closing. The landlord then declined to proceed because AIC had not sent its notice of exercise by certified mail and had failed to deposit $150,000 in escrow. AIC’s counsel addressed these points in a letter to the landlord in September 2005, also offering to prepare the first draft of the declaration of condominium for the two warehouses.
 

 The following month, an attorney for the landlord sent a letter to AIC’s counsel stating that the signed 2002 lease purchase agreement “is not acceptable to my client” and refusing to proceed further with the “required paperwork” unless AIC first deposited 15% of the purchase price. Additional exchanges of letters between the attorneys failed to resolve the matter, and in November, 2005, the landlord’s attorney sent a letter including a statement in all upper case, bold type that the landlord “is no longer interested in selling a portion of the building to your client [AIC].” The letter also advised that the lease would not be extended and that AIC would be required to vacate the premises within 15 days or be subject to double rent. AIC’s lawsuit for specific performance
 
 [6]
 
 and damages followed.
 

 The trial court found that the lease purchase agreement could not be enforced because it lacked a purchase price, an allocation of closing costs, a closing date, “relative square footage” provisions for the condominium documents, a time for down payment, or terms relating to the “existing mortgage.” The final judgment also included findings that AIC failed to show it was ready, willing, and able to close the purchase and that there was “no evidence of bad faith by the seller.” This appeal followed.
 

 Analysis
 

 Our review regarding contract interpretation and the threshold question of enforceability is de novo.
 
 Muniz v. Crystal Lake Project, LLC,
 
 947 So.2d 464, 469 (Fla.3d DCA 2006);
 
 Hammond v. DSY Developers, LLC,
 
 951 So.2d 985, 988 (Fla. 3d DCA 2007).
 

 In this case, the square footage of the warehouse, the price per square foot, and the specific terms of the purchase money financing were expressly included in the lease purchase agreement signed by the parties. As noted, the landlord had already acknowledged in writing that the closing costs would be those “ordinary and customary” in such transactions. The time to close was suggested in two provisions of that agreement: paragraph 6 required a written notice of exercise of the purchase item 90 days before the time of purchase, and option provision (B) allowed the landlord “approximately 90 days in order to prepare condo documents.” When a Florida contract does not specify a particular time for performance, the law implies a reasonable time.
 
 Hammond,
 
 951 So.2d at 988 (quoting
 
 De Cespedes v.
 
 
 *773
 

 Bolanos,
 
 711 So.2d 216, 218 (Fla. 3d DCA 1998)).
 

 By the time of exercise of the option, AIC had occupied the warehouse as a tenant for over three years. Pre-closing inspections were not required under the lease purchase agreement. Similarly, the lead time required by a third-party lender was not a factor, because the landlord had agreed to provide the financing. Upon receipt of the notice of exercise, the landlord’s obligation was to “prepare condominium documents and all related paperwork in order to separate the buildings,” as promised in paragraph 11.
 

 Instead, the landlord made demands and characterizations of the lease purchase agreement terms that were totally unfounded (including, for example, the demand for the cash portion of the purchase price to be placed in escrow and for AIC to comply with the existing mortgagee’s document list). When AIC disagreed, the landlord refused to proceed with the preparation of the condominium documents and the purchase transaction. The landlord’s conduct anticipatorily repudiated the purchase agreement, creating an immediate cause of action for breach.
 
 Twenty-Four Collection, Inc. v. M. Weinbaum Constr., Inc.,
 
 427 So.2d 1110, 1111 (Fla. 3d DCA 1983).
 

 The landlord’s argument, adopted by the trial court, that the lease purchase agreement was an “agreement to agree, or letter of intent,” is not supported by the cases cited in the final judgment and the landlord’s brief. In
 
 de Vaux v. Westwood Baptist Church,
 
 953 So.2d 677 (Fla. 1st DCA 2007), an offeror sought to specifically enforce an alleged agreement by the church to sell a vacant lot. No sale agreement was signed by the parties. Rather, the buyer relied upon a one-page proposal letter sent by the buyer and a one-page set of church business meeting minutes authorizing the Trustees to accept the buyer’s offer “with the Trustees of the church authorized to work out all the details.” The court found that these two papers lacked essential terms (particularly as to purchase money financing), that issues remained for negotiation before a definitive agreement would be signed, and that the church trustees had never communicated an acceptance to the buyer.
 

 In contrast, the lease purchase agreement in this case included the material terms and was formally signed by the landlord and AIC. Each signature was also witnessed by two witnesses, and each party initialed each page. The lease purchase agreement was also attached to, and provided a material part of the consideration for, the lease transaction (memorialized by its own 11-page, duly-executed written agreement).
 

 In
 
 Midtown Realty, Inc. v. Hussain,
 
 712 So.2d 1249 (Fla. 3d DCA 1998), a realtor and buyer sought to enforce a letter of intent as a binding agreement for the purchase of a gas station. The letter of intent contemplated a later “formal Purchase Agreement,” but when such an agreement was prepared and presented the parties did not agree on- its terms. This Court affirmed a final judgment of dismissal, noting that a final agreement was never reached and the letter of intent was not binding. Those facts are also readily distinguishable from the agreements in this case. Similarly,
 
 East Kendall Invs., Inc. v. Bankers Real Estate Partners,
 
 742 So.2d 302 (Fla. 3d DCA 1999) involved a question not presented here: a broker’s right to a commission when the broker procures a ready, willing, and able buyer for the listed property but the seller defeats the transaction before the parties enter into a formal, signed agreement or close the deal.
 

 
 *774
 
 The next case cited in the final judgment and relied upon by the landlord is
 
 Geico Cas. Ins. Co. v. Dupotey,
 
 826 So.2d 380 (Fla. 3d DCA 2002). That case also involved a different question. The issue was whether certain letters between counsel for two insurers constituted an enforceable settlement agreement. This Court held that the letters were merely “a conditional statement of intention to take action in the future ... not a binding commitment.”
 
 Id.
 
 at 382. The lease purchase agreement at issue here is not based on the correspondence of legal representatives or future intentions — it is a formal written agreement to sell the warehouse on specified terms. Finally,
 
 Irby v. Memorial Healthcare Group, Inc.,
 
 901 So.2d 305 (Fla. 1st DCA 2005) is also inapposite.
 
 Irby
 
 involved a letter with a “bullet point outline” for the sale of a medical practice to a hospital. The court affirmed a summary final judgment in favor of the hospital, noting the absence of material terms:
 

 It is clear on the face of the subject letter that it contemplated future actions of the parties which were required to be taken before a binding agreement could be reached. For example, although the letter states that Dr. Irby will be employed as a physician and the medical director for [the hospital], no compensation, benefits, or other employment terms are provided. In addition, the letter states that [the hospital] will buy the gynecology component of Dr. Irby’s practice and facilitate the sale or merger of the remaining obstetrics practice, but no price or other terms are provided.
 

 Id.
 
 at 306. In this case, the lease purchase agreement contains no such “bullet points” or missing terms.
 

 As a matter of law, the purchase agreement was enforceable and was anticipatorily repudiated by the landlord, requiring reversal and remand for the entry of a judgment for AIC’s damages. The agreement did not require AIC to “pay or escrow” the cash portion of the purchase price prior to closing, and no closing date was fixed because of the landlord’s refusal to perform.
 

 The final judgment’s recitation that there was “no evidence of bad faith” must also be reversed. Regarding a seller’s refusal to convey property that has substantially increased in value since the date of the agreement to sell, “bad faith” includes a seller’s failure to establish any reasonable justification for refusing to close.
 
 Port Largo Club, Inc. v. Warren,
 
 476 So.2d 1330, 1334 (Fla. 3d DCA 1985). Here, there is
 
 no
 
 evidence of any such justification, and the record indicates that (a) the fair market value of the warehouse climbed over 50% during the three-plus years of AIC’s occupancy and payment of rent, and (b) the landlord initially acknowledged his receipt of the notice and intention to proceed with the transaction.
 

 Conclusion
 

 The lease purchase agreement in this case may not have been prepared by attorneys. But that does not mean it is unenforceable. It is not a “back of a napkin” outline of terms, or a “letter of intent,” or an agreement to negotiate a more definitive agreement in the future. These parties executed their agreements with all appropriate formalities, and the landlord initially acknowledged the validity of AIC’s exercise of the option. The landlord then attempted to impose additional terms that were not in the agreement and refused to prepare condominium documents as promised. The fact that one legal document remained to be prepared (the declaration of condominium to separate the two warehouses) does not render the lease purchase agreement incomplete or preliminary, as argued by the landlord, and no issue re
 
 *775
 
 garding such a declaration ever arose because the landlord simply refused to have the documents prepared.
 

 Reversed and remanded for further proceedings consistent with this opinion.
 

 [1]
 

 . The trial court also found, and we agree, that the provisions of the lease providing for a waiver of the right to trial by jury and for attorney’s fees and costs to the prevailing party were intended by the parties to apply as well to the companion purchase agreement.
 

 [2]
 

 . The trial court was misled into a finding that "the parties never agreed on the size of the property or whether it would be measured by inside walls or outside walls,” as detailed below.
 

 [3]
 

 .In the acknowledgment letter, however, the landlord stated that the purchase money mortgage would balloon in five years. This was not a term set forth in the lease purchase agreement, which expressly provided for “a 15-year term;” the agreement further stated that AIC “may prepay the entire loan amount” at the end of five years. The cash and purchase money payment amounts in the landlord’s 2005 letter were also premised on the (erroneous) use of 15,153.5 square feet rather than the 15,000 square feet agreed upon in the 2002 agreements. The letter also stated that the cash portion of the purchase price was “required to be placed into escrow with your attorney of record as your good faith deposit.” The lease purchase agreement contained no such requirement.
 

 [4]
 

 . Ordinary and customary terms have been in place for many years in standard purchase forms prepared by The Florida Bar and Florida Association of Realtors. Such terms in- ■ elude the pro rata apportionment of property taxes for the year of the closing based on days of ownership to the date of closing; seller's responsibility for recording costs and documentary stamp taxes on the deed; and buyer’s responsibility for recording costs and stamp and intangible taxes on the purchase money note and mortgage.
 

 [5]
 

 . The bank stated that a proposed mortgagor assuming the landlord's existing mortgage would have to substantiate the source of funds for the 15% equity and provide the “last three fiscal years business financial state
 
 *772
 
 ments,” federal income tax returns, business resumes for the principals of the borrower, and other documents.
 

 [6]
 

 .
 
 Before the non-jury trial in early 2008, AIC elected to proceed only on claims for damages for breach of the lease and the lease purchase agreement.